VOLVO TRADEMARK HOLDING AK-TIEBOLAGET, a Swedish corporation; Volvo Construction Equipment North America, Inc., a Delaware corporation; and Champion Road Machinery Limited, a Canadian corporation, Plaintiffs,

v.

CLM EQUIPMENT COMPANY, INC., a Texas corporation; Future Equipment Company, Inc., a Texas corporation; and Clark Machinery Company, an Arkansas corporation, Defendants.

Volvo Trademark Holding Aktiebolaget, a Swedish corporation, Plaintiff,

v.

Nueces Farm Center, Inc., d/b/a Nueces Power Equipment, a Delaware corporation, Defendant.

CLM Equipment Co., Inc., a Louisiana corporation; Future Equipment Co., a Texas corporation; and Clark Machinery Co., an Arkansas corporation, Plaintiffs,

v.

Volvo Construction Equipment North America, Inc., a Delaware corporation; and Champion Road Machinery, Ltd., a Canadian corporation, Defendants.

Nos. CIV. 1:00CV238, CIV. 1:01CV122, CIV. 1:01CV232.

United States District Court, W.D. North Carolina, Asheville Division.

Dec. 13, 2002.

Carolyn A. Dubay, Hunton & Williams, Raleigh, NC, Michael J. Lockerby, Stephen P. Demm, John Gary Maynard, Kimberley A. Isbell, Hunton & Williams, Richmond, VA, Albert Diaz, Nash E. Long, III, T. Thomas Cottingham, III, Hunton & Williams, Charlotte, NC, for Plaintiffs.

Edward L. Bleynat, Jr., Ferikes & Bleynat, Asheville, NC, J. Michael Dady, Ronald K. Gardner, Scott E. Korzenowski, Dady & Gardner, P.A., Minneapolis, MN, John D. Holland, Dady & Gardner, P.A., Minneapolis, MN, for Defendants.

## MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THESE MATTERS** are before the Court on motions for partial judgment on the pleadings.

## I. PROCEDURAL HISTORY

In the first action filed in this Court, Civil Action No. 1:00cv238, Plaintiffs Volvo Trademark Holding Aktiebolaget (Volvo Trademark), Volvo Construction Equipment North America, Inc. (Volvo CE)[1] and Champion Road Machinery Limited (Champion Road) brought a declaratory judgment action on October 10, 2000. **Complaint, filed October 10, 2000.** On March 19, 2001, the Second Amended Complaint was filed seeking the following relief: (1) a declaration pursuant to the Lanham Act of trademark infringement, unfair competition and dilution; (2) a declaration that the Lanham Act preempts state law claims which are inconsistent therewith; (3) a declaration that there has been no breach of contract by the Plaintiffs; (4) a declaration that there are no ancillary tort law claims against the Plaintiffs; and (5) a declaration that the Plaintiffs have not violated any statutes. Injunctive relief against Lanham Act violations was also sought.

By Answer filed September 14, 2001, Defendants AIS Construction Equipment

---

1. These two entities are collectively referred to as "Volvo."

(AIS), CLM Equipment Company, Inc. (CLM), Future Equipment Company (Future), and Clark Machinery Company (Clark) jointly counterclaimed against the Plaintiffs asserting the following claims: (1) violations of the Arkansas Franchise Practices Act, Ark.Code § 4–72–202, *et seq.;* (2) violations of the Texas Farm, Industrial and Outdoor Power Equipment Dealer Act, Tex. Bus. & Com.Code § 19.01, *et seq.;* (3) violations of the Texas Deceptive Trade Practices and Consumer Protection Act, Tex. Bus. & Com.Code, § 17.41, *et seq.;* (4) violations of the Michigan Motor Vehicle Act, Mich.Comp. Laws Ann., Ch. 445.1561, *et seq.;* (5) violations of the Louisiana Dealer Act, La.Rev.Stat. § 51.481, *et seq.;* (6) violations of Ontario's Arthur Wishart Act; (7) violations of the South Carolina Fair Practices of Farm, Construction, Industrial and Outdoor Power Equipment Manufacturers, Distributors, Wholesalers and Dealers Act, S.C.Code Ann. § 39–6–10, *et seq.;* (8) breach of contract and the covenant of good faith and fair dealing; (9) tortious interference with contractual relations and prospective economic advantage; (10) unjust enrichment; (11) estoppel; and (12) recoupment. AIS has entered into a settlement agreement with the Plaintiffs and has been dismissed by stipulation from the action. The caption has been amended to reflect this dismissal.

On March 20, 2001, AIS, CLM, Future and Clark sued Volvo CE and Champion Road in the United States District Court for the Eastern District of Arkansas asserting the same causes of action as have been asserted in these actions as counterclaims.[2] On August 30, 2001, the Arkansas District Court transferred that action to this District and the case was assigned Civil Case No. 1:01cv232. This Court consolidated the two actions. AIS has also been dismissed from this action and the caption has been amended to reflect this dismissal.

A third action, *Volvo Trademark v. Nueces Farm Center, Inc. (Neuces)*, Civil Case No. 1:01cv122, has been consolidated with the two above; however, Nueces is not involved in the pending motions.

Volvo Trademark, Volvo CE and Champion Road have moved for judgment on the pleadings as such relates to the counterclaims asserted in Civil Case No. 1:00cv238 and the affirmative claims asserted in Civil Case No. 1:01cv232.[3] Because the claims are identical, they will be addressed simultaneously. CLM, Future and Clark are referred to collectively as the Dealers.

## II. STANDARD OF REVIEW

The motions for judgment on the pleadings are brought pursuant to Federal Rule of Civil Procedure 12(c) which provides that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." The same standard is applied to Rule 12(c) motions as to those brought

---

**2.** The language of the claims is identical to the language of the counterclaims.

**3.** The motion in Civil Case No. 1:01cv232 is somewhat confusing because it seeks partial judgment on the pleadings as to six of the twelve causes of action. **Volvo's Motion for Partial Judgment on the Pleadings on the Champion Trademark Licensees' Complaint, filed September 25, 2002.** However, the brief filed in support of that motion addresses the breach of contract claims as well. **Memorandum in Support of Volvo's Motion for Partial Judgment on the Pleadings on the Champion Trademark Licensees' Complaint, filed September 25, 2002.** In Civil Case No. 1:00cv238, Volvo has moved for judgment on the pleadings as to all twelve counterclaims. This inconsistency is also confusing; therefore, the Court will address each of the twelve claims in each action.

pursuant to Rule 12(b)(6). *Burbach Broadcasting Co. of Delaware v. Elkins Radio*, 278 F.3d 401, 405 (4th Cir.2002). A motion pursuant to Rule 12(c)

> does not resolve contests surrounding the facts, the merits of a claim or the applicability of defenses. Accordingly, a Rule 12[c] motion should only be granted if, after accepting all well pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of [its] claim entitling [it] to relief.... [H]owever, [ ] for the purposes of Rule 12[c], [the Court is] not required to accept as true the legal conclusions set forth in a plaintiff's complaint.

*Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir.1999).

## III. FACTUAL BACKGROUND

With these proscriptions in mind, a summary of the pertinent facts is provided. In 1999, Ford Motor Company purchased Volvo's worldwide passenger car business. **Second Amended Complaint, at 13.** Aktiebolaget Volvo (AB Volvo) retained the rights to Volvo's commercial vehicle business. *Id.* In order to ensure that the proper trademark allocations were maintained between the two businesses, Volvo Trademark was formed to protect and enforce those rights. *Id.*

Champion Road was a Canadian corporation which, until recently, manufactured and sold motor graders. *Id.*, at 14. In March 1997, Volvo CE, a wholly-owned subsidiary of AB Volvo, acquired 100 percent of the stock of Champion Road. *Id.* Volvo CE directs the manufacturing and sales activities of Champion Road. *Id.*, at 15. Prior to this acquisition, Champion Road had entered into dealership agreements with CLM, Future and Clark for the sale of motor graders manufactured by Champion Road. **Defendants' Joint Answer and Counterclaim to the Second Amended Complaint, filed September 14, 2001, at 27.** CLM, a Louisiana corporation, had been a Champion Road dealer since June 1984. *Id.*, at 28. Future, a Texas corporation, had been a dealer since 1996 when it acquired 100 percent of the stock of a predecessor Champion Road dealership. *Id.*, at 28–29. Clark, an Arkansas corporation, had been a dealer since 1971, with its most recent agreement signed in 1984. *Id.* Each of the "Distributor Sales Agreements" or "Dealer Agreements" entered into between Champion Road and these corporations contained a provision that "Champion may terminate this Agreement at any time without cause by written notice of termination delivered to Distributor, such termination to be effective not less than sixty (60) days after receipt or deemed receipt by Distributor of such notice." **Exhibits D, ¶ 24.4; E, ¶ 24.4; and F, ¶ 24.4,** *contained in* **Index of Exhibits to Second Amended Complaint, filed March 19, 2001.** Other pertinent provisions were as follows:

18. Trademarks: Dealer acknowledges Champion's exclusive right, title and interest in and to the trademark "Champion" and all other trademarks or trade names of Champion ... and will not, at any time, do or cause to be done any act or thing, directly or indirectly, contesting, or in any way impairing ... [the same].... Upon any termination of this Agreement, Dealer shall immediately cease using any and all trademarks and trade names of Champion and its affiliates.

· · · · ·

24.6. Neither Champion nor Dealer shall, by reason of any termination or non-renewal of this Agreement, be liable

to the other for compensation, reimbursement or damages on account of the loss of prospective profits or anticipated sales, or on account of expenditures, investments, leases, property improvement, or commitments in connection with the business or good will of Champion, of the Dealer, or otherwise. IN NO EVENT SHALL CHAMPION BE LIABLE FOR CONSEQUENTIAL OR SPECIAL DAMAGES DUE TO ANY CAUSE WHATSOEVER.

. . . . .

27. CHANGES IN CHAMPION PRODUCTS: Champion reserves the right at any time to change models, classification of models and specifications, or add to or discontinue any products or product lines without notice to Dealer and without incurring any obligation to incorporate such changes in any other products.

. . . . .

33.1. This Agreement and any accompanying Exhibits contain the entire and only agreement between the parties ... and any representations, terms or conditions in connection therewith not incorporated herein shall not be binding upon either party....

33.2. This Agreement, and any modification, renewal, waiver, extension or termination hereof, shall not be valid unless in writing and signed by a duly authorized officer of Champion.

*Id.*, at ¶¶ 18, 24.6, 27, 33.1, 33.2.

When Volvo CE acquired the stock of Champion Road, the two parties entered into an agreement concerning these prior dealership agreements. **Second Amended Complaint,** at 15. In that agreement, Volvo CE and Champion Road acknowledged that each of them manufactured

products used in construction and road building which were compatible and that the parties desired to distribute all these products through the same dealers. *Id.,* **at Exhibit B**.

In addition to this goal, some of the Volvo and Champion distributors are not performing in an acceptable manner and there is good cause to terminate them. To accomplish this goal and to remove non-performing distributors, [the parties] will need to renegotiate, amend, or terminate their relationship with many of their existing distributors. To facilitate achieving these goals, one entity needs to have full authority to manage, negotiate, amend, terminate, and establish distributor relationships. *Therefore, Champion hereby appoints Volvo as its sole and exclusive agent to manage, negotiate, amend, terminate, and establish distributor relationships for Champion products.* This work is to be done in Volvo's sole and exclusive discretion. Volvo may take all of these actions (including binding legal action of any type) in its own name or in the name of Champion as Volvo deems best.... This Agreement shall be governed by the internal laws of the state of North Carolina.

*Id.* (**emphasis added**).

In February 1997, Champion Road notified its dealers that Volvo CE had acquired 100 percent of its stock.[4] **Defendants' Joint Answer,** at 34. On October 10, 2000, Clark and CLM were notified that their dealership agreements were terminated without cause effective January 9, 2001. **Second Amended Complaint,** at 52. Future was similarly notified on January 19, 2000, of its effective termination date of March 19, 2000. *Id.*

---

4. The Defendants' joint answer refers to Exhibit A as a copy of that notification. No such exhibit has been attached to either the original or any copy of the pleading.

Beginning January 1, 2001, Champion Road stopped manufacturing motor graders under the Champion trademark. *Id.*, at 54. "Champion Road only manufactures motor graders under the Volvo Marks for supply to Volvo Construction and other members of the Volvo Construction Equipment Group." *Id.* Champion Road is now known as Volvo Motor Graders Ltd. **Memorandum in Support**, at 3.

## IV. DISCUSSION

### A. Breach of Contract Claims.

■ The Dealers allege that by terminating the dealership agreements without cause, Volvo and Champion Road breached those agreements. "There is not a single word in the written agreements that gives Champion or its successor the right to terminate the dealership by relabeling the product." **Champion Dealer's Memorandum,** at 3. And, they argue the contract is ambiguous in three respects: (1) the word "products" can be interpreted as Champion Road manufactured motor graders and also as Champion Road "branded" motor graders; (2) the provision allowing Champion Road to "discontinue" products does not define that to include "re-branding" the motor graders with the Volvo trade-

mark; and (3) the agreement contains no definition for termination "with cause" or "without cause."

The parties do not dispute that the dealership agreements contain choice of law provisions which they apparently agree should be applied by this Court.[5] As to the agreements with CLM and Clark, South Carolina choice of law provisions were included. **Exhibits D & F, *supra*,** ¶ 29. Future's agreement contained an Ontario choice of law provision. **Exhibit E, *supra*.** Thus, the issue of a breach of these contracts is governed by South Carolina and Ontario law.

Both South Carolina and Ontario law provides that where the language of a contract is clear and unambiguous, its construction is a matter of law for the Court, not a jury. *Black v. Freeman*, 274 S.C. 272, 262 S.E.2d 879 (1980); *Corporate Properties, Ltd. v. Manufacturers Life Ins. Co.*, 1989 CarswellOnt. 623 (1989).

"Where an agreement is clear and capable of legal construction, the court's only function is to interpret its lawful meaning, discover the intention of the parties as found within the agreement, and give effect to it." The court must enforce an

5. "While the [contracts] in this case contain a choice of law provision providing that [South Carolina and Ontario] law governs, the parties' choice of law provision is enforceable only to the extent that the chosen law does not violate a fundamental public policy of the forum state, [North Carolina]." *Accrued Fin. Servs., Inc. v. Prime Retail*, 298 F.3d 291, 297 (4th Cir.2002). It is also worth noting that because these contracts involve the sale of manufactured goods, the Uniform Commercial Code applies. *Mulberry–Fairplains Water Ass'n v. Town of N. Wilkesboro*, 105 N.C.App. 258, 265–66, 412 S.E.2d 910 (1992). The Code permits the parties to a contract to make choice of law provisions provided the state selected has a reasonable relationship to the transaction. N.C. Gen.Stat. § 25–1–105(1); *Wohlfahrt v. Schneider*, 82 N.C.App.

69, 74, 345 S.E.2d 448 (1986). Since 1993, Champion Road manufactured some of the motor graders sold to its dealers in Charlotte, North Carolina. **Second Amended Complaint**, at 14. It is, therefore, arguable that South Carolina and Ontario, in particular, do not have a reasonable relationship to the transaction and that North Carolina law should be applied. *Id.* Such an argument is particularly compelling given the fact that CLM is a Louisiana corporation, Clark is an Arkansas corporation, and Future is a Texas corporation; yet, the choice of law provisions specify South Carolina and Ontario. However, since the parties have not so argued and North Carolina law is the same as that of the state and province selected, the Court will not delve further into this issue.

unambiguous contract according to its terms regardless of its ... apparent unreasonableness, or the parties' failure to guard their rights carefully. It has long been held that to ascertain the intention of an instrument, the court must first look to its language, and if it is perfectly plain and capable of legal construction, then that language alone determines the instrument's force and effect.

*Koontz v. Thomas,* 333 S.C. 702, 708–709, 511 S.E.2d 407 (1999); *Eli Lilly & Co. v. Novopharm, Ltd.,* [1998] 2 S.C.R. 129 (S.C.C.1998) (**"Indeed, it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face."**).

Applying these principles to the dealership agreements at hand, "products" were defined in the agreement as "Champion's motor graders and accessories and attachments therefore" and as "700 Series Only" [motor graders] "together with accessories and attachments therefore manufactured or distributed by Champion." **Exhibits D, E, & F,** *supra,* at 2. The Dealers argue that the phrase "together with accessories and attachment therefore manufactured or distributed by Champion" should be interpreted to include any motor grader manufactured or distributed by Champion Road regardless of its trademark, *i.e.,* motor graders manufactured by Champion Road under the Volvo mark. However, the plain language of the provision clearly refers to accessories and attachments for the 700 Series motor graders (which were manufactured by Champion Road under its mark), not to any product manufactured or distributed by Champion regardless of the trademark thereon.

Common sense and good faith are the leading touchstones of construction of the provisions of a contract; where one construction makes the provisions unusual or extraordinary and another construction which is equally consistent with the language employed would make it reasonable, fair and just, the latter construction must prevail.... When a contract is unambiguous, clear and explicit, it must be construed according to the terms the parties have used, to be taken and understood in their plain, ordinary and popular sense.

*C.A.N. Enterprises, Inc. v. South Carolina,* 296 S.C. 373, 377, 373 S.E.2d 584 (1988); *United States for the Use and Benefit of Williams Elec. Co. v. Metric Constructors, Inc.,* 325 S.C. 129, 135, 480 S.E.2d 447 (1997); *accord, Gore v. Nationsbanc Ins. Co.,* 570 S.E.2d 115, 116 (2002). Applying these principles to the definition of products, the Dealers' interpretation is not only strained but clearly one which the parties did not have in mind at the time the contracts were entered. *Id.,* ("'**A party to a written contract where there is no ambiguity or indefiniteness in the essentials, cannot say their minds did not meet.**'").

■ The Dealers also argue that the provision which allowed Champion Road to discontinue any product is ambiguous: "(1) is a 're-branding' of a product a discontinuation of that product; and (2) can Champion terminate the relationship by 'discontinuing' its products ... ?" **Champion Dealers' Memorandum,** at 8. Using language most often applied in cases involving the Petroleum Marketing Practices Act (PMPA), the Dealers claim that market withdrawal is not an acceptable basis on which to terminate their contracts.[6] The short answer to the Dealers'

---

**6.** Of course, the PMPA does not apply to the dealership contracts at issue, since it is a statement of Congressional intent to create a uniform set of rules covering grounds for the termination of motor fuel marketing franchises. *PDV Midwest Refining v. Armanda Oil &*

position is that Volvo did not terminate the dealership contracts by virtue of discontinuing production of Champion Road motor graders or withdrawing that product from the market; the contracts were terminated pursuant to the provision discussed. *infra* for termination without cause.

The section of the contracts at issue provides that "Champion reserves the right at any time to ... add to or discontinue any products or product line without notice to Dealer and without incurring any obligation to incorporate such changes in any other products." **Exhibit E**, at 19. Champion Road sold its stock to Volvo which discontinued the Champion Road motor grader but continued to have Champion Road manufacture the same product under the Volvo trademark.[7] Indeed, Champion Road in name no longer exists. The word "discontinue" means "to cease to produce." *Merriam–Webster's Collegiate Dictionary.* Reading the provisions of the contract as a whole, Champion Road could at any time with or without notice "cease to produce" its line of motor graders. Thus, when Volvo determined that Champion Road motor graders would bear the Volvo trademark, Champion discontinued its line of graders. *See, e.g., McElroy v. B.F. Goodrich Co.,* 73 F.3d 722, 725–27 (7th Cir.1996) **(The court interpreted the phrase** *"permanently* **discontinue production" to mean total abandonment of the business, not the sale of the tradename. Thus, when the tradename was sold, there was no breach of the contract concerning the** *permanent* **discontinuation of production and production could continue by the purchaser.);** *accord, Valtrol, Inc. v. General Connectors*

*Corp.,* 884 F.2d 149, 153 (4th Cir.1989) **("The question of whether a cessation of business constitutes a breach of a distributorship contract does not often arise because most distributorship arrangements may be terminated unilaterally upon notice by either party.").** "There is no novelty in interpreting contractual language in the light of common sense.... [T]he body of knowledge that goes by the name 'common sense' is part of the context of interpreting most documents ...." *Id.*

■ The Dealers also attack the provision for termination without cause on 60 days' notice, claiming it is both ambiguous and contains an implied condition. "The ambiguity is whether 'without cause' means 'for a reason [cause] to be determined in Champion's discretion that is not expressly stated in this agreement' or 'arbitrarily and no reason at all.'" **Memorandum,** at 6. Section 24.2 provides that if the dealer does not develop adequate sales, *etc.,* Champion Road will provide 30 days within which to cure the default, after which time the contract may be terminated if not cured. **Exhibit D**, at 14. Section 24.3, however, gives Champion Road the right to terminate the contract immediately by giving the dealer notice if there is death of the principal, transfer or assignment of the contract, conviction of the principal of a crime, *etc. Id.* Section 24.4 allows termination without cause on 60 days' notice. *Id.* And finally, Section 24.5 provides for termination without any notice in the event of bankruptcy and similar events. *Id.* The Dealers argue that "[r]ead in conjunction with the remainder of § 24, § 24.4 is a discretionary provision that required Volvo to have some reason

---

*Gas,* 305 F.3d 498 (6th Cir.2002). Even so, the sale by a franchisor of its trademark is a lawful ground for the termination of a franchise under the Act. *Id.*

7. For purposes of these motions, the undersigned assumes *arguendo* that the products do not differ while recognizing Volvo's position that modifications have been made.

for termination and to exercise discretion in making that decision." **Memorandum,** at 7.

The structure of Section 24, however, is clear:

(1) Pursuant to Section 24.2, if the dealers do not perform, "Champion may terminate this Agreement by giving Dealer notice of default and allowing Dealer thirty (30) days to cure such default. If such default has not been cured by the end of such thirty (30) day period, Champion may, at any time thereafter, *terminate this Agreement immediately upon notice to Dealer.*" **Exhibit D,** *supra* (**emphasis added**). This language provides that termination is for cause and is effective when notice is given.

(2) Likewise, Section 24.3 provides that upon the occurrence of other specified events, such as the death of a principal, "Champion may *terminate this Agreement immediately by giving to the Dealer or its representative written notice* of such termination . . . ." *Id.* (**emphasis added**). Again, the termination is for cause and is effective when notice is given.

(3) Section 24.4 provides that "Champion may terminate this Agreement at any time *without cause by written notice of termination* delivered to Dealer, such termination to be *effective not less than sixty (60) days* after receipt or deemed receipt by Dealer of such notice." *Id.* (**emphasis added**). Under this section, termination is without cause but becomes effective the 60th day after notice is given.

(4) Finally, Section 24.5 provides that the "Agreement *shall terminate automatically and without the giving of notice* in the event" of specified occurrences. *Id.* (**emphasis added**).

The language of the contract does not leave to chance the issue of whether and when notice is required or the issue of when termination becomes effective. The Dealers' argument that Section 24.4 has an implied condition that termination without cause means causes other than those outlined in other sections is contrary to the clear and unambiguous language of the contract. *Pero–Lan Canada Ltd. v. Protor–Ulon Distrib.,* 1995 CarswellOnt. 26 (C.A.1995) (**A term cannot be implied into a contract which contradicts or is inconsistent with the express terms of the written contract.**); *Waldrep Bros. Beauty Supply v. Wynn Beauty Supply,* 992 F.2d 59, 60, 62 (4th Cir.1993) ("**In this diversity case, plaintiff seeks to erect the tort law of South Carolina as a barrier to the forces of market competition. . . . Waldrep's contracts with Redken and Sebastian were non-exclusive and terminable at-will, with or without cause.**").

This interpretation is supported by an Ontario case dealing with the termination of a distributorship agreement. In *Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd.,* 1986 CarswellNS 147 (S.C.C.1986), the contract contained a clause providing for the termination of the agreement by the manufacturer for cause "by notice in writing to Distributor by mail" which became effective "upon the giving of such notice." However, a separate clause provided that either party "at any time, with or without cause," could terminate the agreement "by written notice given to the other of them by mail" and did not contain any provision as to the effective date of the notice. The Supreme Court of Ontario found an ambiguity between the two provisions and held the second would be construed as requiring reasonable notice in the absence of a clear statement of when it became effective. As noted above, however, the con-

tracts in this case clearly provided (1) whether termination was with or without cause; (2) whether and how notice was to be given; and (3) when termination became effective.

The undersigned, therefore, finds that the language of the contracts is clear, specific and unambiguous. As a result, neither Champion Road nor Volvo breached the contracts with the Dealers by terminating the dealership agreements.

**B. Parol evidence to establish a breach of contract.**

█ Because the Court finds the contracts unambiguous, the Dealers' argument that parol evidence should be allowed is rejected. "The parol evidence rule prevents the introduction of extrinsic evidence of agreements or understandings contemporaneous with or prior to execution of a written instrument when the extrinsic evidence is to be used to contradict, vary or explain the written instrument. This is especially true when the written instrument contains a merger or integration clause." *Gilliland v. Elmwood Prop.*, 301 S.C. 295, 301, 391 S.E.2d 577 (1990); *Thompson v. First Citizens Bank & Trust Co.*, 567 S.E.2d 184 (2002). Such is the case here. See, **Exhibits D, ¶ 33.1; E, ¶ 33.1; F, ¶ 32.1, attached to Motion ("This Agreement and any accompanying Exhibits contain the entire and only agreement between the parties respecting the sale to and the purchase and distribution by Dealer of Products and Parts, and any representations, terms or conditions in connection therewith not incorporated herein shall not be binding upon either party. This Agreement wholly cancels, terminates and supersedes any agreement heretofore entered into between the parties, or their successors or assigns, pertaining to Products and Parts.");** *accord, Eli Lilly & Co.,*

*supra* **("Indeed, it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face.").**

However, the Dealers claim the parol evidence rule does not prevent the admission of consistent explanations of the provisions of the contracts. The "consistent explanations" to which the Dealers refer are their claims that Champion Road assured them, despite the clause providing for termination without cause, that their contracts would only be terminated for inadequate performance after notice and an opportunity to cure.

> There is no question that parol evidence is competent to show a distinct and independent agreement entered into between the parties to a written contract *at the same time so long as the oral agreement does not contradict or vary the written....* In an action on a [contract] where parole evidence is sought to be introduced to the effect that the maker is not to be liable under certain conditions, the introduction of such evidence violates the rule against parol evidence and is, therefore, not admissible.

*Ray v. South Carolina Nat'l Bank, Inc.,* 281 S.C. 170, 172, 314 S.E.2d 359 (1984) (emphasis added); *Gutierrez v. Tropic Int'l, Ltd.,* 2002 CarswellOnt 2599 (Ont.C.A.2002) **(Moreover, such alleged agreements cannot survive the integration clause of the agreement.).** Thus, the simultaneous oral representations alleged by the Dealers contradict or vary the written terms providing for termination without cause and, therefore, may not be admitted into evidence. To the extent that the Dealers claim these oral representations were made subsequent to the contract, the parol evidence rule does not apply. *Lee v. Thermal Eng'g Corp.,* 572 S.E.2d 298, 2002 WL 31410618 (S.C.App,2002) **(The parol evidence rule**

does not apply to subsequent oral modifications of a written agreement, evidence of which may be heard.); *Garry v. Sternbauer Estate,* 2000 CarswellOnt. 2588 (2000); *Muther–Ballenger v. Griffin Elec. Consultants, Inc.,* 100 N.C.App. 505, 397 S.E.2d 247 (1990).

In the alternative and through argument presented in a footnote, the Dealers claim that subsequent to the contracts, Champion Road assured them the contracts would not be terminated except for inadequate performance after an opportunity to cure had been provided. These assurances, they claim, are subsequent oral modifications to the contracts. The allegations of their pleadings in support of these claims are as follows:

> Both before and after Champion Road signed up [Clark], Champion Road representative Ned Hodges assured [Clark] that it would be allowed to continue as the only dealer of Champion road-manufactured products in the Little Rock trade area, so long as [Clark] adequately performed. This promise was subsequently reconfirmed over the years by other Champion Road representatives, including, but not limited to Champion Road representatives Ralph Ehl, Chuck Brown and Rick Chapman.

> Likewise, Champion Road representative Ralph Ehl told CLM, both before and after the time CLM signed up as a dealer of Champion Road-manufactured products, that CLM would be allowed to continue as the only dealer of Champion Road-manufactured products in its trade area, so long as CLM was doing an adequate job of representing the line. Not surprisingly, Champion Road made the same representations to [Future], again, both before and after the time [Future] was signed up as a dealer. More specifically, Champion Road representative Giulio Frasson told [Future],

both before and after the time [Future] was originally signed up as dealer of Champion Road-manufactured products, that [Future] could continue as the only dealer of Champion Road-manufactured products in its trade area so long as [Future] adequately performed.

**Defendants' Joint Answer and Counterclaim to the Second Amended Complaint, at 31–32.**

It is true that "[w]ritten contracts, [ ] may be orally modified by the parties, even if, as here, the writing itself prohibits oral modification." *South Carolina Nat'l v. Silks,* 295 S.C. 107, 108, 367 S.E.2d 421 (1988). However, those subsequent modifications must be supported by consideration, as is true with any contract. *Id.; accord, Capro Inv., Ltd. v. Tartan Dev. Corp.,* 1998 CarswellOnt.1968 (1998). "Valuable consideration may consist either of some right, interest, profit or benefit accruing to the one party, or some forbearance, detriment, loss of responsibility given, suffered or undertaken by the other." *South Carolina Nat'l Bank, supra,* at 111, 367 S.E.2d 421. Assuming such representations were made after the written dealership contracts, the Dealers have failed to allege any additional consideration. They wanted to continue to be Champion Road dealers and in order to do so, they were obligated by the contracts to expend their effort and good will to develop a customer base and to expand the same. **Exhibits D, E, F,** *supra.* There is no allegation that anything over and above what was called for in the contract itself was given in consideration for the purported subsequent oral modifications. As a result, the Dealers have failed to show subsequent oral modifications.

**C. Breach of the implied** covenant of good faith.

▇ The Dealers also claim that Champion Road and Volvo violated the implied

covenant of good faith by terminating the agreements without cause.[8] "[I]n South Carolina, there exists in every contract an implied obligation of good faith and fair dealing." *United States f/u/b/a Williams Elec.*, 325 S.C. at 132, 480 S.E.2d 447; *accord, Granitile, Inc. v. R. Granitile, Inc.*, 1998 CarswellOnt. 4689 (1998); *Bicycle Transit Auth. v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299 (1985). "However, there is no breach of an implied covenant of good faith where a party to a contract has done what provisions of the contract expressly gave him the right to do." *Adams v. G.J. Creel & Sons, Inc.*, 320 S.C. 274, 277, 465 S.E.2d 84 (1995); *Marleau v. Savage*, 2000 CarswellOnt. 2226 (2000); *IRT Property Co. v. Papagayo, Inc.*, 112 N.C.App. 318, 435 S.E.2d 565 (1993), *rev'd on other grounds*, 338 N.C. 293, 449 S.E.2d 459 (1994) (**Exercising a discretionary power conferred by the provisions of a contract does not violate a covenant of good faith.**). Volvo gave the Dealers notice of the termination of the agreements and no more was required either under the express terms of the contract or the implied covenant of good faith.

### D. The quasi-contractual claims of unjust enrichment, promissory estoppel and recoupment.

█ The Dealers allege that over the years they developed good will in their businesses and that when Volvo terminated their agreements and entered into agreements with competing dealers, Volvo was unjustly enriched.[9] "Absent an express contract, recovery under [unjust enrichment] is based on quasi-contract . . . ." *Pitts v. Jackson Nat'l Life Ins. Co.*, 574

S.E.2d 502 (S.C.App.2002) (citing *Columbia Wholesale Co., Inc. v. Scudder May, N.V.*, 312 S.C. 259, 260, 440 S.E.2d 129 (S.C.1994)); *Bright v. QSP, Inc.*, 20 F.3d 1300, 1305 (4th Cir.1994) ("**Because an 'action for unjust enrichment is quasi-contractual in nature[, it] may not be brought in the face of an express contract.'**"); *Cotroneo v. Leslie*, 1997 CarswellOnt. 3748 (1997) (**The elements of a claim for unjust enrichment are that the defendant has been enriched by the receipt of a benefit; the enrichment corresponds with the deprivation of the plaintiff; there is no juristic reason for the enrichment, such as a contract; and it would be unjust to allow the defendant to retain the benefit.**); *Southeastern Shelter Corp. v. BTU, Inc.*, —— N.C.App. ——, 572 S.E.2d 200 (2002). Because the parties had a clear, unambiguous contract, no cause of action for unjust enrichment is available.

█ The Dealers also claim that Champion Road's representations that their agreements would not be terminated except for cause gives rise to promissory estoppel. "Such representation[s] and commitments include[d] a promise to the dealers that they would be fairly evaluated in comparison with their Volvo counterparts and had an equal opportunity to become the beneficiary of the combined Volvo line." **Answer with Counterclaims**, at 64. This argument fails factually because there were no Volvo counterparts when the agreements were executed and evidence of such representations or promises allegedly made thereafter is not admissible.

8. It is noted that the Dealers do not argue that termination occurred without notice. Indeed, it appears that between Champion Road and Volvo, the Dealers had almost three years' notice that the agreements would be terminated.

9. This argument is somewhat circuitous as it would appear that the new dealers were in fact enriched instead of Volvo.

Moreover, where there is a written contract, South Carolina law does not recognize an affirmative cause of action for promissory estoppel. *Charleston County Sch. Dist. v. Laidlaw Transit, Inc.*, 348 S.C. 420, 559 S.E.2d 362 (2002). And, in Ontario, "estoppel, it has been held, may be used as a shield but not as a sword .... Promissory estoppel does not found a cause of action.'" *Express Energy Corp. v. Case Canada Corp.*, 2000 CarswellOnt. 3581 (2000) (citing *Gilbert Steel Ltd. v. University Constr. Ltd.*, 1976 CarswellOnt. 466 (Ont.C.A.1976)); *accord, Home Electric Co. v. Hall & Underdown Heating & Air Conditioning Co.*, 86 N.C.App. 540, 542–43, 358 S.E.2d 539 (1987) ("**[North Carolina] Courts have never recognized [the doctrine of promissory estoppel] as a substitute for consideration, either in construction bidding, or in any other context. The North Carolina cases which have applied the doctrine have only done so in a defensive situation .... North Carolina case law has not approved the doctrine for affirmative relief.**").

█ The last quasi-contractual claim is that of recoupment: "The Champion Dealers did not receive a reasonable period of time in which to recoup their substantial investments they made to become and remain dealers of Champion road-manufactured equipment prior to termination." **Answer with Counterclaims, at 66.** This claim is totally contrary to the Dealers' representations that in February 1997 Champion Road notified them of the Volvo acquisition. Moreover, recoupment only reduces a plaintiff's claim against a defendant; it does not allow for the recovery of an affirmative monetary judgment. *Tuloka Affiliates, Inc. v. Moore*, 275 S.C. 199, 268 S.E.2d 293 (S.C.1980). "A recoupment remedy is unavailable if termination of the distribution agreement was justified, as a matter of law, and not unreasonable." *Valtrol, Inc. v. General Connectors, Corp.*, 884 F.2d 149, 154 (4th Cir.1989). Here, the undersigned has found the termination of the dealership agreements justified as a matter of law and, therefore, no claim for recoupment exists. Moreover, Ontario law does not recognize the claim of recoupment except in situations in which a party has been compelled by law to make a payment for which he did not expose himself to liability and which payment discharged an actual liability of the defendant. *Ramik Prop. v. Ariesman*, 1991 CarswellOnt.2071 (1991).

As a final comment on the Dealers' contractual claims, the Court finds language from the Fourth Circuit appropriate:

> A primary purpose of contract formation is to provide stable business relationships in the face of generally changing economic conditions. Parties who seek commercial stability in shifting economic circumstances accomplish this goal by allocating risks. There may be risks, however, which through inattention or design, are not allocated by contract, and both parties therefore stand to rise or fall together on the success of a joint enterprise. [T]his is such a case.

*Valtrol*, 884 F.2d at 152.

**E. The impact of choice-of-law provisions on state law claims.**

As previously noted, the agreements at issue contain choice-of-law provisions requiring the application of South Carolina and Ontario law. More specifically, the choice-of-law provisions read as follows:

> This Agreement and the rights and obligations of the parties hereunder shall be governed by and construed and enforced in accordance with the laws of the Province of Ontario.

**Exhibit E [relating to Future],** *attached to* **Motion, at 20.**

This Agreement has been formalized in South Carolina, and the rights, duties and obligations of the parties as set forth herein shall be settled and determined according to the laws of the State of South Carolina.

**Exhibits D, F [relating to CLM and Clark],** *attached to* **Motion.**

The Dealers' complaint and counterclaims, however, have alleged violations of the Arkansas Franchise Practices Act, Ark.Code § 4–72–202, *et seq.,* relating to Clark; violations of the Texas Farm, Industrial and Outdoor Power Equipment Dealer Act, Tex. Bus. & Com.Code § 19.01, *et seq.,* relating to Future; violations of the Texas Deceptive Trade Practices and Consumer Protection Act, Tex. Bus. & Com.Code, § 17.41, *et seq.,* relating to Future; and violations of the Louisiana Dealer Act, La.Rev.Stat. § 51.481, *et seq.,* relating to CLM[10] The issue, then, is whether the choice-of-law provisions preclude claims brought pursuant to the state law of the states in which the Dealers are incorporated.

A federal court exercising diversity jurisdiction, as in the present case, must apply the substantive law of the state in which it sits, which includes applying the forum state's choice of law rules . . . . In North Carolina, as in most other states, parties to a contract may agree in advance as to the choice of law that will govern any disputes that arise between them . . . . Section 105 of the North Carolina Commercial Code provides in pertinent part that "when a transaction bears a reasonable relation to this State and also to another state or nation the parties may agree that the law either of

this State or of such other state or nation shall govern their rights and duties . . . ." Thus, as a general matter, choice of law clauses are enforceable in North Carolina. . . . It is therefore necessary to determine whether the nature of [the] claims under the [various state laws have] any effect on the parties' choice of law agreement. . . . [Where] the nature of the liability . . . imposed by the [state] statute is *ex delicto*[11], not *ex contractu,* . . . [n]o issue of contractual construction, interpretation, or enforceability is raised.

*Republic Indus., Inc. v. Atlantic Veneer Corp.,* 166 F.3d 1210, 1999 WL 7859 *2–3 (4th Cir.1999). Thus, where no such contractual issues are raised, the choice-of-law provision will not preclude a cause of action based on a state statute.

**F. Clark's claim pursuant to the Arkansas Franchise Practices Act.**

■ Considering first the Arkansas Franchise Practices Act, Ark.Code Ann. §§ 4–72–201, *et seq.,* it is alleged that Clark "is an Arkansas corporation with its principal place of business in Little Rock, Arkansas." **Answer with Counterclaims,** at 28. However, Clark's dealership agreement contains a South Carolina choice-of-law provision. The issue is whether, in view of that choice-of-law provision, Clark may bring a claim pursuant to the Arkansas Franchise Practices Act which "provides remedies for persons whose rights as franchisees have been terminated without good cause." *Dr. Pepper Bottling Co. of Paragould v. Frantz,* 311 Ark. 136, 140, 842 S.W.2d 37 (1992). "One abuse the act was intended to remedy is wrongful terminations[ ]" which the Act defines as termi-

---

**10.** There are also alleged violations of the Michigan Motor Vehicle Act, Mich. Comp. Laws Ch. 445.1561, *et seq.* However, since AIS was the only party to claims pursuant to

that statute, they are no longer a part of this action.

**11.** Arising out of tort, as opposed to contract. *Black's Law Dictionary.*

nations without good cause. *Id.,* at 143, 842 S.W.2d 37. In a recent case, the Eighth Circuit has interpreted the impact of choice-of-law provisions on a party's claim under the Act. In *Heating & Air Specialists, Inc. v. Jones,* 180 F.3d 923, 930 (8th Cir.1999), the franchise agreement contained a provision that "[t]his Agreement is executed in duplicate on the above date and the laws of the State of Texas shall govern its *interpretation.*" *Id.* (**emphasis added**).

> This language is in sharp contrast with the more broad choice of law clauses scattered throughout the cases, providing that the law of a particular state would "govern the contract," "govern the rights and obligations of the parties," or "govern the interpretation and enforcement of the contract." The language that Lennox used in its dealer agreements, when read according to its plain meaning, does not effectively displace the entire body of Arkansas protective legislation but merely provides that Texas rules of contract construction should apply.

*Id.* However, the language used in Clark's choice-of-law provision is not similarly narrow; in fact, it encompasses both the contract and the "duties and obligations of the parties as set forth herein." Thus, according to Arkansas law, the broad language of the choice-of-law provision displaces the Arkansas Franchise Practices Act. *Id.*

The same conclusion is reached by applying North Carolina choice of law rules. "North Carolina federal district courts have similarly rejected the application of contractual choice of law provisions to any actions which do not specifically arise out of the contract." *Robinson v. Ladd Furniture, Inc.,* 995 F.2d 1064, 1993 WL 211309 *5 (4th Cir.1993). Clearly, any action pursuant to the Arkansas Franchise Practices Act must by definition arise out of the contract. The Act defines "franchise" as "a written or oral agreement for a definite or indefinite period in which a person grants to another person a license to ... sell or distribute goods or services ...." Ark.Code Ann. § 4–72–202(1)(A). The undersigned therefore finds, using the choice of law rules dictated by Fourth Circuit and North Carolina precedent that the provisions in the agreements at issue preclude a cause of action pursuant to the Arkansas Franchise Practices Act. *Porter Hayden Co. v. Century Indem. Co.,* 136 F.3d 380, 383 (4th Cir.1998) ("**The Agreement's choice-of-law provision can reasonably be read merely as specifying that [South Carolina] substantive law be applied to resolve disputes arising out of the contractual relationship.**").

### G. Future's claims pursuant to the Texas Deceptive Trade Practices Act.

 Future is alleged to be a Texas corporation with its "principal place of business in Euless, Texas." **Answer with Counterclaims,** *supra.* Nonetheless, its dealer agreement contains a choice-of-law provision mandating that Ontario law be applied to the contract "and the rights and obligations of the parties hereunder." Future alleges that Champion Road's representations that the agreement would not be terminated as long as there was adequate performance constituted an "unconscionable act or course of action" pursuant to the Texas Deceptive Trade Practices Act. *Id.* In addition, it alleges that Champion Road represented that the agreement conferred "rights, remedies or obligations which it [did] not have." *Id.* Again, these claims are clearly "disputes arising out of the contractual relationship" and would be precluded by the choice-of-law provision in the agreement. *Porter Hayden, supra.* "Since the Court must determine the validity and enforceability of the contractual

[termination provisions], the nature of liability is *ex contractu* and thus, subject to the parties' choice of law agreement. The fact that the claim is brought under the [Texas Deceptive Trade Practices Act] has no effect on the parties' choice of law. In accordance with the terms of the agreement, the law of [South] Carolina should apply." *Republic Indus., supra,* at *3. As a result, no cause of action pursuant to the Texas statute exists.

■ However, assuming *arguendo* that the Act applied, Future could not state a claim.

To recover under the DTPA [Deceptive Trade Practices Act], one must be a "consumer," which means the claimant must have sought or acquired goods or services by purchase or lease, and must show that these same goods or services formed the basis for the DTPA complaint. The DTPA defines "goods" as "tangible chattels or real property purchased for use," and it defines services as "work, labor, or services purchased or leased for use, including services furnished in connection with the sale or repair of goods." The DTPA excludes those transactions that convey wholly intangible property rights. The question of whether a plaintiff is a consumer under the DTPA is a question of law for the trial court. ACI purchased an intangible property right, to wit, the right to act as Fisher's sales representative under the "Representative Agreement." The purchaser of such an intangible business right is usually not a "consumer" under the DTPA, unless qualifying "collateral services" are an *objective of the transaction* and not merely incidental to the purchase. In other words, the goods or services acquired must form the basis of the DTPA claim. [ ] ACI did not purchase a "franchise," with typical associated collateral services[.]

Rather, ACI merely contracted to be a "sales, engineering and service representative" for Fisher products in Alaska. ACI did not pay a franchise fee, or any other type of fee, for this representative right. ACI was to solicit orders for Fisher products, transmit the orders to Fisher, and receive a commission when the customer paid Fisher. ACI could also buy Fisher products at a discount and resell them on its behalf. . . . [T]he few "collateral services" Fisher agreed to provide ACI under the contract were merely *incidental* to the transaction, rather than being *an objective* of the transaction. Therefore, ACI is not a "consumer" under the DTPA with regard to the claims asserted as to the "Representative Agreement."

*Fisher Controls Int'l, Inc. v. Gibbons,* 911 S.W.2d 135, 138 (Tex.App.1995). There is no difference between the arrangement in the *Fisher* case and that at hand. Future's "Dealer Agreement" provides that the relationship of the parties is that of "vendor and vendee." **Exhibit E,** *attached to* **Motion,** at 12. At issue was Future's intangible right to be a Champion Road dealer, not the actual motor graders sold by Future. *Id.,* at 2 ("**The Dealer shall promote, sell, service and rent Products and Parts in the following Area of Primary Responsibility . . . .**"). There has been no allegation that Future paid for this intangible right and no such payment is reflected in the agreement. To the contrary, the objective of the agreement was to be authorized Champion Road dealer and thereby receive Champion Road products at the "current dealer net prices" together with other "reasonable sums" for handling, servicing, *etc. Id.,* at 7. The crux of the agreement was the right to sell Champion Road's products and the Court therefore finds that Future would not qualify as a consumer under the DTPA in any event. *Fisher, supra; accord,*

*Johnson v. Walker,* 824 S.W.2d 184, 187 (Tex.App.1991); *Nelson v. Data Terminal Sys., Inc.,* 762 S.W.2d 744, 747 (Tex.App. 1988).

Moreover, to the extent that Future has been damaged, those "damages were caused by the [termination] of the agreement. Therefore, [Future] did not show that [its] damages were caused by any DTPA violation concerning the goods or services alleged ...." *Id.; ARA Auto. Group v. Central Garage,* 124 F.3d 720 (5th Cir.1997) (**Manufacturer not liable to distributor under the DTPA for terminating the dealership agreement under the terms of the contract.**). Even more to the point is the fact that the claims asserted under the DTPA are in reality based solely on allegations of breach of contract. *Id.* "A mere breach of contract allegation, without more, is not a "false, misleading or deceptive act" in violation of the DTPA." *Enterprise–Laredo Assoc. v. Hachar's, Inc.,* 839 S.W.2d 822, 828 (Tex.App.1992). "The distinction between a breach of contract claim and a DTPA violation appears 'when an alternative interpretation of the contract is asserted, and the dispute arises out of the performance of the contract.' The DTPA is not violated when such a distinction exists and traditional contract principles are applied to the dispute." *Id.,* at 828–29. That is precisely the case at hand. Future's allegation is that "through words and courses of dealing and customs and practices, that [Future] would continue as the only dealer of Champion Road-manufactured products located in [Future's] trade area so long as it capably performed, and that [Volvo] and/or Champion Road would furnish to [Future] with reasonable support, ... and the contrary actions ... including the ultimate termination of [Future's] dealerships for Champion Road-manufactured equipment, constitutes an unconscionable act or course of action un-

der the DTPA." **Answer with Counterclaim, at 44.** This is nothing more than "an alternative interpretation of the contract" and does not state a claim under the Act. *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 327–28 (5th Cir.2002) (**The issue is not one of fact but one of pleading.**).

## H. Future's claim pursuant to the Texas Power Equipment Dealer Act.

▪ In addition to the DTPA claim, Future has alleged that Champion Road violated the Texas Farm, Industrial & Outdoor Power Equipment Dealers' Act (PEDA) by terminating the dealer agreement without cause. It is true that the Act provides that a manufacturer may not terminate a dealer agreement with a supplier except for cause. However, as noted previously, such a claim would arise out of an "issue of contractual construction, interpretation, or enforceability" and thus, the parties' choice-of-law provision would preclude the state law claim. *Porter Hayden, supra; Robinson, supra; Republic Indus., supra.*

Moreover, counsel for Volvo and Champion Road aptly note that the Act was amended in 1999 to make it applicable to "off-road construction equipment." Prior to that time, such equipment, including motor graders, was not covered by the Act. However, that amendment is only applicable to agreements entered into on or after the effective date of the amendment, September 1, 1999. Tex. Bus. & Com. § 19.01 ("**This Act takes effect September 1, 1999, and applies only to an agreement entered into on or after that date. An agreement entered into before the effective date [ ] of this Act is governed by the law in effect on the date the agreement was entered into, and that law is continued in effect for that purpose.**"). Future alleged in its counterclaim that it acquired 100 percent of the stock of a former Champion Road dealer in

1996. Answer with Counterclaim, at 28. "As a result, [Future] had been a dealer of Champion Road-manufactured products since July 15, 1996." *Id.*, at 29. Thus, the Act clearly does not apply to Future.[12]

## I. CLM's claim pursuant to the Louisiana Dealer Act.

 CLM claims that the Louisiana Dealer Act (LDA) precludes the termination of a dealer agreement without cause. That Act applies to written contracts or oral agreements of definite or indefinite duration between any . . . corporation engaged in the business of selling [or] distributing . . . construction . . . equipment . . . and any . . . manufacturer . . . of such equipment . . . whereby the retailer agrees with the . . . manufacturer . . . to maintain a stock of such parts, or complete equipment . . . . La.Rev.Stat. 51:481(A). The Act provides a civil remedy for termination of a dealership agreement or contract without good cause. La. Rev.Stat. 51:482. Again, as noted previously, CLM's "choice-of-law provision can reasonably be read [ ] as specifying that [South Carolina] substantive law be applied to resolve disputes arising out of the contractual relationship." Hayden Porter, *supra.* Thus, that provision precludes a state law claim based on the LDA because that statute involves an interpretation of the contract at hand.

Moreover, the Fifth Circuit has addressed this issue. In *Cherokee Pump & Equip., Inc. v. Aurora Pump*, 38 F.3d 246 (5th Cir.1994), the plaintiff distributor entered into a contract with the defendant manufacturer which provided for termination without cause and which also contained a choice-of-law provision designat-

ing the contract would be governed by Illinois law. When the manufacturer terminated the agreement without cause, the distributor brought suit pursuant to the LDA. Like North Carolina, Louisiana's choice-of-law statute recognized such provisions "except to the extent that [the other state's] law contravenes the public policy" of Louisiana. *Id.*, at 250–51.

As a federal court sitting in diversity, it would be inappropriate for us to formulate a statement of Louisiana public policy. Accordingly, we conclude that there is no statutory or jurisprudential authority to suggest that the notice requirement and opportunity to remedy provision in the [LDA] constitute a statement of public policy which would displace the choice-of-law provision and hold that Illinois law applies to the contract.

*Id.*, at 253. The Court therefore concludes that the LDA claim also fails as a matter of law.

## J. Future's claim pursuant to the Arthur Wishart Act.

Volvo and Champion Road noted that the Act does not apply if the business operated by the dealer or franchisee is not located in Ontario. The Dealers agree with this assessment and have stipulated to dismiss this claim.

## K. Clark's and CLM's claims pursuant to the South Carolina Fair Practices of Farm, Construction, Industrial and Outdoor Power Equipment Manufacturers, Distributors and Dealers Act (S.C. Dealers Act).

 Effective June 14, 2000, it became unlawful in South Carolina for a manufacturer to terminate a dealership agreement

---

**12.** In this regard, Future's allegation in its brief is troubling. Counsel argues that "Volvo does not deny that its conduct would violate the statute. The only question is whether Future is entitled to the protection of the statute, and there is simply no record upon

which the Court can make that determination." **Memorandum**, at 21 n. 20. Since Future's pleading clearly alleges that it became a dealer on July 15, 1996, this statement is misleading.

without due cause. S.C.Code § 39–6–130. On October 10, 2000, Clark and CLM were given notice that their contracts were terminated without cause. If the Act applies to any agreement in existence on June 14, 2000, then it applies to these two Dealers' agreements.[13]

Volvo and Champion Road argue that because neither Clark nor CLM had a dealership located within South Carolina, the Act does not apply to them. The Dealers claim residency is not a requirement under the Act. The Act provides that it is applicable to "a person who engages directly or indirectly in purposeful contacts within this State in connection with the offering or advertising of equipment for sale or has business dealings with respect to equipment within this State ...." S.C.Code § 39–6–30. The pertinent portions of the Counterclaims allege as follows:

> [Clark] is an Arkansas corporation with its principal place of business in Little Rock, Arkansas. [Clark] sells, rents and services construction equipment, industrial machinery and other related implements. [Clark] had been a dealer of Champion Road-manufactured products since at least 1971.

> CLM is a Louisiana corporation with its principal place of business in Lafayette, Louisiana. CLM sells, rents and services construction equipment, industrial machinery and other related implements. CLM had been a dealer of Champion Road-manufactured equipment since June 1984, when Champion Road-manufactured equipment was marketed directly to the dealers by Champion Road Machinery International Corporation, a predecessor of Champion Road.

**Answer with Counterclaims, at 28.**

> Both before and after Champion Road signed up [Clark], Champion Road rep-

resentative Ned Hodges assured [Clark] that it would be allowed to continue as the only dealer of Champion Road-manufactured products *in the Little Rock Trade area,* so long an [Clark] adequately performed....

> Likewise, Champion Road representative Ralph Ehl told CLM, both before and after the time CLM signed up as a dealer of Champion Road-manufactured products, that CLM would be allowed to continue as the only dealer of Champion Road-manufactured products *in its trade area,* so long as CLM was doing an adequate job of representing the line.

*Id.,* at 32 (**emphasis added**).

The agreements of both CLM and Clark contained the following provision: "Distributor shall promote the sale of products and parts at retail and shall promote the servicing and rental of such products in the following *area* of primary responsibility ...." **Exhibits D, F, *attached to* Volvo's Motion (emphasis added).** CLM's agreement defined its area of primary responsibility as 12 counties in Louisiana. *Id.,* at Exhibit D. Clark's agreement defined its area of primary responsibility as 57 counties in Arkansas. *Id.,* at **Exhibit F.**

The Dealers have made no allegation that either CLM or Clark did any business in South Carolina or that they had any meaningful business contacts with South Carolina. The South Carolina Act does not apply to them unless they have a presence within that State. In other words, applying the substantive and statutory law of South Carolina, the Act does not apply to any dealer unless it has *"purposeful contacts within this State* in connection with the offering or advertising of equip-

---

**13.** The Court has not successfully located any South Carolina law dealing with this Act.

ment for sale or *has business dealings with respect to equipment within this State.*" S.C.Code § 39–6–30. Since the pleadings here do so allege, judgment as a matter of law is appropriate.[14]

## L. The Dealers' claims for tortious interference with contract and prospective economic advantage.

██ The Dealers have also alleged that pursuant to South Carolina and Ontario law, Volvo tortiously interfered with its contracts and with prospective economic advantage. In support of these claims, they have alleged:

The Champion Dealers had substantial, valuable, long-term customer relationships with customers acquiring Champion Road-manufactured products and parts, which have produced revenues, and which were reasonably certain to produce substantial future revenues .... Additionally, the Champion Dealers had ongoing and continuing contractual relationships with certain customers for service, maintenance and repair work.

. . . . .

The conduct of [Volvo] in terminating the Champion Dealers' dealership agreements, without cause, and in violation of the agreements ... was undertaken with the express intention of interfering with the Champion Dealers' relationships and prospective economic advantages arising from the sales, service and rental of Champion Road-manufactured equipment and parts to the Champion Dealers' customers, as well as being undertaken by [Volvo] with the express intention of interfering with the contrac-

tual relationship the [ ] Dealers had with Champion Road.

Additionally, the attempts by [Volvo] to convince the Champion Dealers' customers that they should buy product[s] from Volvo dealers, rather than the Champion Dealers, prior to the termination, was undertaken with the express intention of interfering with the contractual relationship and/or prospective economic advantage the [ ] Dealers had with their customers.

**Answer with Counterclaims,** at 60–63. The Dealers have also alleged that they were led to believe and did believe "that they would retain their existing customers, despite the ownership change from Champion Road to Volvo, and *the Champion Dealers' customers did, in fact, stay with the Champion machines after the acquisition.*" *Id.,* at 35.

In its brief opposing Volvo's motion, the Dealers state that they do not seek "damages *for Volvo's interference with the Dealers' agreements with Champion.* That being said, the Dealers' counterclaims for tortious interference *with existing and prospective customers* should not be dismissed." **Memorandum,** at 24. It should also be noted that although the language of the counterclaim alleges that Champion Road also tortiously interfered with the Dealers' prospective contractual relationships, no such cause of action exists against Champion Road. *Ross v. Life Ins. Co. of Virginia,* 273 S.C. 764, 259 S.E.2d 814 (1979) (**A cause of action for tortious interference with contract is limited to situations where the action is brought against a third party, not the parties to the contract with which there**

---

**14.** The Dealers cite *Tractor & Farm Supply v. Ford New Holland,* 898 F.Supp. 1198 (W.D.Ky.1995), in support of their position that the South Carolina Act should apply. In that action, it was noted that the Kentucky dealer "consistently dealt with" the Pennsylvania manufacturer's office in Michigan and thus, enforced the Michigan choice-of-law provision. The case is therefore inapposite to this one.

was alleged interference.). Moreover, since Volvo acquired 100 percent of Champion Road's stock, Volvo acquired all the assets and liabilities of Champion Road, including the dealership agreements. Volvo then became a party to those agreements and, thus, the cause of action against Volvo cannot stand. *Id.; accord Threlkeld v. Christoph*, 280 S.C. 225, 226, 312 S.E.2d 14 (1984).

Moreover, the Dealers cannot prove one of the essential elements of the claim. The elements of a cause of action for tortious interference with contract are (1) the existence of a valid contract; (2) knowledge on the part of the wrongdoer of the contract; (3) the intentional procurement of a breach thereof; (4) the absence of any justification; and (5) damages resulting from the breach. *Camp v. Springs Mortgage Corp.*, 310 S.C. 514, 426 S.E.2d 304 (1993); *accord, D.G. Jewelry, Inc. v. Cyberdiam Canada, Ltd.*, 2002 CarswellOnt. 1382 (2002). Applied to this action, it is clear that Volvo knew of the existence of the dealership contracts; however, without a breach of the contract there can be no cause of action for tortious interference with that contract. *Todd v. South Carolina Farm Bureau Mut. Ins., Co.*, 287 S.C. 190, 336 S.E.2d 472 (1985) (**Without the intentional procurement of a breach of the contract, there can be no tortious interference with the contract.**). Since the Court has found that the contracts were not breached, this claim falls as well. *Id.; Collins Music Co. v. C.W. Smith*, 332 S.C. 145, 503 S.E.2d 481 (1998) (**The breach of the contract is an essential element of both a cause of action for breach of contract and for tortious interference with contract.**). Moreover, Ontario law requires that the conduct of

the interfering party be illegal. *D.G. Jewelry, supra* ("**The gist of this tort is an alleged unlawful act committed by a person or persons with the intention to injure another which does, in fact, cause economic loss.**").

A cause of action for intentional interference with prospective contractual relations requires proof of (1) intentional interference with potential contractual relations; (2) for an improper purpose or by an improper method; (3) resulting in injury.[15] *Brown v. Stewart*, 348 S.C. 33, 557 S.E.2d 676 (2001); *A Fisherman's Best, Inc. v. Recreational Fishing Alliance*, 310 F.3d 183, 195 (4th Cir.2002) (applying South Carolina law); *1175777 Ontario, Ltd. v. Magna Int'l, Inc.*, 2001 CarswellOnt. 1446. The factual allegations of the counterclaim show as a matter of law that the Dealers cannot state such a claim. While they made a blanket allegation that Volvo attempted to coerce customers to switch to Volvo products, "despite the ownership change from Champion Road to Volvo, and *the Champion Dealers' customers did, in fact, stay with the Champion machines after the acquisition.*" **Answer with Counterclaims**, at 35.

Moreover, the South Carolina Court of Appeals has recently noted that "[g]enerally, there can be no finding of intentional interference with prospective contractual relations if there is no evidence to suggest any purpose or motive by the defendant other than the proper pursuit of its own contractual rights with a third party." *United Educ. Distrib., LLC v. Educational Testing Service*, 350 S.C. 7, 14, 564 S.E.2d 324 (2002). Such is the case at hand. Champion Road had a right to terminate the Dealers' contracts without cause on 60 days' notice. Volvo purchased

---

**15.** It does not appear that South Carolina recognizes the tort of tortious interference with economic advantage. *United Educ. Distrib., LLC v. Educational Testing Service*, 350 S.C. 7, 564 S.E.2d 324 (2002).

558

Champion Road and therefore, acquired these contractual rights. Volvo had the absolute right to pursue its own contractual rights to discontinue the Champion Road line. "What is actionable is the luring away, by devious, improper and unrighteous means, of the customer of another." *Id.,* at 15, 564 S.E.2d 324 (citing *Printing Mart–Morristown v. Sharp Elec. Corp.,* 116 N.J. 739, 563 A.2d 31 (1989)). "The tort of intentional interference with economic relations requires more than intention to injure and action taken in furtherance of that intention. It requires unlawful means." *1175777 Ontario, Ltd., supra.* "[M]ere business competition where the defendant takes no 'purposeful action' to cause the plaintiff financial harm is not actionable." *Id.,* at 16, 564 S.E.2d 324 (citing *SNA, Inc. v. Array,* 51 F.Supp.2d 554, 567 (E.D.Pa.1999)); *accord, Southern Contracting, Inc. v. H.C. Brown Constr. Co., Inc.,* 317 S.C. 95, 450 S.E.2d 602 (1994). Exercising a contractual right to discontinue a product and to terminate a contract is nothing more than business competition. *Combs & Assoc. v. Kennedy,* 147 N.C.App. 362, 555 S.E.2d 634 (2001).

## V. ORDER

**IT IS, THEREFORE, ORDERED** that the motion of Volvo and Champion Road for partial judgment on the pleadings is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that the counterclaims asserted in Case No. 1:00cv238 are hereby **DISMISSED**, and the affirmative claims asserted in Case No. 1:01cv232 are hereby **DISMISSED**; and

**IT IS FURTHER ORDERED** that the motion to strike is hereby **DENIED**.