United States Court of Appeals,

Fifth Circuit.

No. 93-5610.

CHEROKEE PUMP & EQUIPMENT INC., Plaintiff-Appellant,

v.

AURORA PUMP, a Unit of General Signal and General Signal Corp., Defendants-Appellees.

Nov. 23, 1994.

Appeal from the United States District Court for the Western District of Louisiana.

Before REAVLEY, DeMOSS and STEWART, Circuit Judges.

STEWART, Circuit Judge:

This diversity case arises out of a contract dispute between an Illinois manufacturer and one of its regional distributors located in Louisiana. The issue concerns whether the manufacturer had the right to terminate the distributorship agreement without stating the cause, giving sixty days notice. The district court concluded that the manufacturer did have such a right to terminate under Louisiana law as it existed at the time the agreement was confected. The court denied the distributor's motions for preliminary and permanent injunctions and granted summary judgment in favor of the manufacturer. Although we conclude that the district court erroneously found that Louisiana law applied to the contract, we nonetheless affirm because, under governing Illinois law, the manufacturer had the right to terminate the agreement.

*Facts*

Cherokee Pump & Equipment, Inc., is a Shreveport, Louisiana,

1

company that serves as a regional distributor for commercial and industrial pumps manufactured by Aurora Pump of Aurora, Illinois.

Aurora and Cherokee have enjoyed a business relationship dating back to 1980. Over the years, Cherokee and Aurora have operated under several different distributorship agreements. In April 1991, the contract at issue in this litigation was executed by the parties. This "Engineered Products Distributor Agreement" ("the Agreement") provided for a renewable one-year contract term[1] and stated that either party could terminate the contract without cause by giving 30 days notice.[2] It also stated that Illinois law would govern any dispute arising from the Agreement and contained a forum selection provision whereby Cherokee agreed to submit to the jurisdiction of Illinois in the event of a dispute concerning the contract.[3]

The preamble of the Agreement stated that "[t]his AGREEMENT is in effect only when the current year ADDENDUM is attached and duly executed." But the only addendum attached and executed was for the one-year period starting in January 1991 and ending on the last day

---

[1]The contract reads: "This AGREEMENT is issued for one year and is renewed each year between AURORA and DISTRIBUTOR for dates listed on the attached ADDENDUM subject to termination as provided herein."

[2]"Either party may terminate the AGREEMENT, with or without cause, at any time, upon thirty (30) days written notice sent by registered mail as measured from the postmark date."

[3]"This AGREEMENT shall be interpreted and construed in accordance with the laws of the State of Illinois. DISTRIBUTOR [Cherokee] agrees to submit to the jurisdiction of ... Illinois and further agrees that such courts shall have exclusive jurisdiction over all matters pertaining to this AGREEMENT and the relationship established by this AGREEMENT."

of that year. Although no new addendum was executed for either 1992 or 1993, the parties continued to do business under the terms of the Agreement, except for at least one modification of Cherokee's sales quota. This course of events continued until July 1993, when Aurora notified Cherokee of its intent to terminate the Agreement effective September 30, 1993.

*Procedural Background*

On September 28, 1993, Cherokee filed suit in Louisiana state court seeking to enjoin Aurora from terminating their contract. Cherokee asserted that Aurora's termination without cause violates Louisiana law. In support of its position, Cherokee pointed to Louisiana's Repurchase Statute, La.R.S. 51:481, *et seq.,* which places significant restrictions on the rights of manufacturers to terminate dealer agreements.

In particular, Louisiana Revised Statutes 51:482(A)(1) prohibits a distributor from terminating, cancelling, failing to renew, or substantially changing the competitive circumstances of a dealership agreement or contract without "good cause." Louisiana 51:482(C) expressly requires that 90 days advance notice be given to the dealer before cancellation and that the dealer be given 60 days to correct any alleged deficiency.

The state court issued a temporary restraining order, enjoining Aurora from terminating the agreement. Aurora immediately removed the case to federal district court on the basis of diversity. Aurora filed a motion to dismiss, which the federal court converted to a motion for summary judgment. Aurora's motion

3

was based upon two alternative grounds:  (1) that the amended version of the Repurchase Statute did not come into effect until September 1991, four and a half months after Cherokee and Aurora executed their Agreement and therefore the statute's termination requirements constitutionally could not be applied retroactively to Aurora[4];  and (2) alternatively, that pursuant to the Agreement's choice-of-law provision, Illinois law was applicable, meaning that Aurora's termination of the agreement was permissible and Cherokee was not entitled to an injunction.[5]

The district court denied Cherokee's motions for preliminary and permanent injunctions and granted summary judgment in favor of Aurora on all of Cherokee's claims, concluding that injunction was inappropriate because Cherokee could not show a likelihood of success on the merits.  In fact, the court concluded that quite the opposite was true:  *Aurora* was entitled to summary judgment under applicable law.

The district court based its decision upon its conclusion that the choice-of-law provision in the Agreement was not enforceable because the application of Illinois law would violate the public policy of Louisiana, as espoused in the Repurchase Statute.  The court further concluded that although Louisiana law governs the

---

[4]"No State shall ... pass any ... ex post facto Law, or Law impairing the Obligation of Contracts...."  U.S. CONST. art. I, § 10, cl. 1.

[5]Cherokee has conceded that it would prevail *only* if Louisiana law were applied to the contract, because Illinois has no provision in its law to prevent Aurora from terminating the contract as it did.

4

Agreement, the Repurchase Statute's termination requirements may not be applied retroactively to this agreement, due to the constitutional prohibition, because the contract was executed for an indefinite term beginning in April 1991,[6] over four months prior to the effective date of the amendment to the Repurchase Statute. Thus, because the termination requirements of the Repurchase Statute cannot constitutionally be applied to the Agreement, the judge determined that Aurora had the right to terminate the Agreement without cause.

Accordingly, the district court denied Cherokee's motions for preliminary and permanent injunctions and granted summary judgment in favor of Aurora, dismissing Cherokee's suit. This appeal followed.

## Standard of Review

### The preliminary injunction

We review the denial of a preliminary injunction only for abuse of discretion. *Hull v. Quitman Co. Bd. of Educ.,* 1 F.3d 1450 (5th Cir.1993); *White v. Carlucci,* 862 F.2d 1209 (5th Cir.1989). Four elements are required for the grant of a preliminary injunction. First, the movant must establish a substantial likelihood of success on the merits. Second, there must be a

---

[6]The trial court rejected Cherokee's argument that instead of one contract with an indefinite term, the parties had actually entered into a series of one-year contracts. Thus, Cherokee argued that although the original 1991 Agreement was created *before* the effective date of the amended Repurchase Statute, the subsequent "contracts" in 1992 and 1993 were created *after* the statute's effective date; therefore, under Cherokee's interpretation the statute could have been applied to Aurora's termination of the agreement in 1993.

5

substantial threat of irreparable injury if the injunction is not granted. Third, the threatened injury to the plaintiff must outweigh the threatened injury to the defendant. Fourth, the granting of the preliminary injunction must not disserve the public interest. *Sierra Club v. FDIC,* 992 F.2d 545 (5th Cir.1993), *citing Canal Authority of Florida v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974). "A preliminary injunction is an extraordinary remedy. It should only be granted if the movant has clearly carried the burden of persuasion on all four *Callaway* prerequisites. The decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Mississippi Power & Light v. United Gas Pipe Line Co.,* 760 F.2d 618 (5th Cir.1985).

*The motion for summary judgment*

We review a district court's grant of summary judgment de novo. *Topalian v. Ehrman,* 954 F.2d 1125 (5th Cir.1992). Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits filed in support of the motion, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

We review de novo a district court's determination of state law on a summary judgment motion. *Willis v. Roche Biomedical Laboratories, Inc.,* 21 F.3d 1368 (5th Cir.1994); *Mills v. Davis Oil Co.,* 11 F.3d 1298 (5th Cir.1994). Accordingly, the district court's choice-of-laws determination is reviewed de novo. *Arochem*

6

*Corp. v. Wilomi, Inc.,* 962 F.2d 496 (5th Cir.1992); *Federal Deposit Insurance Corp. v. Massingill,* 24 F.3d 768 (5th Cir.1994).

An appellate court can affirm the granting of summary judgment on any ground supported by the record, *Matter of Jones,* 966 F.2d 169, 172 (5th Cir.1992), even where the district court granted summary judgment based upon erroneous reasoning.[7] *Davis v. Liberty Mut. Ins. Co.,* 525 F.2d 1204, 1208 (5th Cir.1976).

## *Discussion*

Cherokee argues on appeal that the district court erred as a matter of law in its determination that, under Louisiana law, the contract was for an indefinite term, that La.R.S. 51:481, *et seq., could not be applied retroactively due to constitutional restrictions to prevent Aurora's termination of the agreement, and that Cherokee did not establish a substantial* likelihood of success on the merits.

Because we affirm on a different basis than that relied upon by the district court and conclude that Illinois law will apply to the dispute, thereby upholding the choice-of-law provision in the contract, we do not reach the constitutional question, nor do we reach the issue of whether this contract would be considered one for an indefinite term under Louisiana law. We conclude that summary judgment in favor of Aurora was proper under Illinois law, it being undisputed that Aurora would prevail if Illinois law were applied to the contract.

---

[7]Cherokee's argument that the district court's choice-of-law determination is the law of the case due to Aurora's failure to file a cross-appeal is meritless.

Federal courts sitting in diversity must apply the choice-of-law rules of the state in which they are located. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Thus, we apply Louisiana's choice-of-law principles to determine whether Illinois or Louisiana law governs the contract.

Louisiana has a new set of choice-of-law provisions, recently codified as Book IV of the Louisiana Civil Code. These articles apply to all actions filed after January 1, 1992, and thus are applicable in this case.

Louisiana Civil Code Article 3540, entitled "Party autonomy," generally gives contracting parties the freedom to choose which state's law will govern disputes arising out of the contract. This article forms the basis for the primary issue on appeal. It provides:

> All other issues of conventional obligations [besides capacity and form] are governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537.

Louisiana Civil Code Article 3537, in turn, states the general rule applicable to conventional obligations:[8]

> Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
>
> That state is determined by evaluating the strength and

---

[8]Louisiana is unique among the states in that it is a civil law jurisdiction, as opposed to one governed by common law; accordingly, its jurists use the civilian term "conventional obligation" to refer to a contract.

pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

Louisiana Civil Code Article 3515, in turn, contains the general and residual choice-of-law rule pertinent to all types of cases, not just those involving conventional obligations. It provides that:

> Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
>
> That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

By considering the factors listed both in Article 3537 and in Article 3515, it is easy to see that Louisiana clearly is the state's law that "would otherwise be applicable" in the absence of a choice-of-law provision in the contract. Both Louisiana and Illinois have an interest in having their law apply to the contract, but Louisiana's interest in having its law applied *in the absence of a choice-of-law provision by the parties* would be stronger than that of Illinois, as the district court correctly concluded. The overall purpose of the Agreement was the

9

establishment of Cherokee as an Aurora dealer in Louisiana. Cherokee is a Louisiana corporation whose performance under the contract took place in Louisiana. Aurora is authorized to do and doing business in Louisiana. Louisiana customers purchase the pumps Aurora manufactures via Aurora's distributorship arrangement with Cherokee. Louisiana has an interest in protecting all its citizens, both distributors and consumers. It also has an interest in policing to some extent those companies such as Aurora who do business within its borders, who enter into contracts with Louisiana citizens, and who introduce their products into the stream of commerce for end-use here in Louisiana. The only competing interest Illinois has is in protecting Aurora, one of its citizens. Under the relevant policies of Articles 3515 and 3537, Louisiana's law would govern under a normal choice-of-law analysis.

However, given the existence of the choice-of-law provision in the contract, which states that Illinois law will apply to any dispute concerning the Agreement, we must also look to Article 3540, *infra.* Under Article 3540, Louisiana law "would otherwise be applicable" to this dispute absent the choice-of-law provision. Thus, also under Article 3540, Illinois law, as the law "expressly chosen" by the parties will govern, except to the extent that law contravenes the public policy of Louisiana.

*Does the application of Illinois law to the contract contravene the public policy of Louisiana?*

The next step in our analysis thus focuses on whether the application of Illinois law would contravene any public policy of Louisiana. The district court felt that the Repurchase Statute,

10

with its termination restrictions on manufacturers, espoused a public policy on the part of the Louisiana that manufacturers should not be applied to terminate such a distributorship agreement at will.[9]  The court stated that:

> Protection from the perceived imbalance in bargaining positions between national manufacturers and local distributors and the economic hardships associated with maintaining industrial equipment inventories are but a few of the strongly held beliefs behind the Legislature's decision [in passing the Repurchase Statute].

The district court thus concluded that, because Louisiana has enacted provisions which require manufacturers to provide distributors with 90 days notice and 60 days opportunity to correct any alleged deficiency, Louisiana has a *public policy* against allowing manufacturers to terminate distributorship agreements without complying with La.R.S. 51:481 *et seq.*  Illinois law contains no such provision requiring the giving of notice and the opportunity to correct deficiencies.  Cherokee concedes that under

_____

[9]Because we conclude that the application of Illinois law to the contract does not violate Louisiana public policy as espoused in the Repurchase Statute, we merely note in passing the flaws inherent in the district court's determination, on the one hand, that the Repurchase Statute is inapplicable to the agreement, but on the other hand, that the Repurchase Statute provides the basis for determining that there is a Louisiana public policy against termination-at-will contracts.  The district court recognized that such reasoning is vulnerable to "the oft-quoted criticism of "circularity,' " but sought to avoid such a criticism by stating that it merely was assuming *arguendo* that Louisiana's statute would apply.  Such an analysis is inconsistent—if the statute is held inapplicable for constitutional reasons, likewise it must be assumed inapplicable, even for purposes of argument, in determining whether Louisiana has a public policy against termination-at-will contracts.  Arguably, it would unconstitutionally "impair the Obligations of Contracts" to apply the statute retroactively in order to "find" a Louisiana public policy here which would invalidate a choice-of-law determination made by the parties prior to the enactment of that statute.

Illinois law, Aurora has the right to terminate the agreement. Consequently, the judge determined that the application of Illinois law to the contract would contravene the public policy of Louisiana; thus, under Louisiana Civil Code Article 3540, the choice-of-law provision in the contract could not be upheld. We disagree.

Admittedly, Illinois law does not contain a provision which would prevent Aurora from terminating the agreement. Cherokee has conceded this point. However, the fact that Louisiana law does contain such a provision does not mean that the application of Illinois law to the issue of whether Aurora had the right to terminate as it did (without giving 90 days notice, stating the causes for termination, and affording Cherokee a chance to remedy) would violate Louisiana public policy. Just because Louisiana would reach a different result on the right to terminate does not mean that the application of Illinois law to this dispute would violate Louisiana public policy.

The law of a state and its public policy are not necessarily synonymous. Not every law enacted by the legislature embodies the "public policy" of the state. As the official comments to Article 3540 note, "only strongly held beliefs of a particular state qualify for the characterization of "public policy.' " Comment (f) to La.Civ.C. art. 3540.

Unfortunately, Article 3540 does not elucidate what constitutes the public policies of the State of Louisiana. Instead, it is one of "those frequent cases where the Code refers

12

the judge to his own judgment ... by the use of indeterminate words which demand appraisal of values ... such as "public policy.' " James L. Dennis, *The 21st John M. Tucker, Jr. Lecture in Civil Law: Interpretation and Application of the Civil Code and the Evaluation of Judicial Precedent,* 54 La.L.Rev. 1 (1993).[10]

However, because we are a federal court sitting in diversity, we are *Erie*-bound[11] to rely upon Louisiana judicial and legislative authority to analyze whether the Repurchase Statute as amended embodies the public policy of the state of Louisiana.

If every Louisiana statute were deemed to constitute public policy, the *exception* in Article 3540 to the general rule of party autonomy in choice-of-laws determinations would be wholly consuming and would strip the *general* rule in the article of all its meaning. The result would be that parties would have the right to choose the application of another state's law only when that state's law is identical to Louisiana's. Such an approach would be ridiculous.

In order to support a finding of Louisiana public policy on a particular issue, something more must be shown than just the fact that the other state's law differs from Louisiana's. The late Judge Alvin Rubin, who was a distinguished member of this Court and also a Louisiana jurist steeped in Louisiana's civilian tradition, made this identical observation in *Delhomme Industries, Inc. v. Houston Beechcraft,* 669 F.2d 1049, 1058 (5th Cir.1982): "One state's law does not violate another state's public policy merely

---

[10]Justice Dennis sits on the Louisiana Supreme Court.

[11]*Erie Railroad Co. v. Tompkins,*

because the law of the two states differ."  Judge Rubin also noted:

> A choice of law provision in a contract is presumed valid until it is proved invalid....  The party who seeks to prove such a provision invalid because it violates public policy bears the burden of proof....  Courts are reluctant to declare such provisions void as against public policy....  Courts favor, and tend to uphold, choice of law provisions in contracts, particularly when such provisions are used in interstate transactions....

*Ibid.*

In *Delhomme,* the buyer and seller of an airplane had entered into a contract calling for the application of Kansas law.  One of the claims that the plaintiff made against the defendant was in redhibition under Louisiana law, a remedy apparently not available under Kansas law.  The plaintiff argued that the court should ignore the parties' choice of Kansas law, claiming that Louisiana public policy would be contravened by the application of Kansas law due to Louisiana's public policy against the easy waiver of redhibitory rights.  Judge Rubin rejected this claim and applied Kansas law notwithstanding the fact that a different outcome would have resulted under Louisiana law.

Under *Delhomme,* Aurora bears the burden of proving that the parties' choice-of-law selection is invalid.  We conclude that Aurora has not met that burden.  It has adduced no authority to establish that the amendment to the Repurchase Statute expresses a public policy of Louisiana that would displace the choice-of-law determination made by the parties.  There is nothing in the amendment to the Repurchase Statute itself to indicate that a "strongly held belief" or "public policy" of the state was being fostered or protected by the amendment.  Moreover, there is nothing

14

in the amendment to indicate that the statute prevents or overrides a choice-of-law by the parties which precludes application of the statute.[12]

Likewise, there is no case law evidencing that the Repurchase Statute amendment espouses public policy in Louisiana or otherwise rendering null and void any contractual provision that would displace its notice requirements and opportunity to remedy provision. As a federal court sitting in diversity, it would be inappropriate for us to formulate a statement of Louisiana public policy. Accordingly, we conclude that there is no statutory or jurisprudential authority to suggest that the notice requirement and opportunity to remedy provision in the Repurchase Statute constitute a statement of public policy which would displace the choice-of-law selection made by Aurora and Cherokee. We give effect to the choice-of-law provision and hold that Illinois law applies to the contract. In light of this holding, Cherokee's entire appeal fails, by its own admission. Thus, we do not reach the constitutional question or the issue of the term of the

---

[12]In stark contrast to the Repurchase Statute, other Louisiana statutes cited by Aurora for illustrative purposes, do contain such statements of public policy or purpose. For example, Louisiana's Oilfield Indemnity Act, La.R.S. 9:2780, states that:

> It is the intent of the legislature by this Section *to declare null and void and against public policy of the state of Louisiana any provision in any agreement* which requires defense and/or indemnification, for death or bodily injury to persons, where there is negligence or fault (strict liability) on the part of the indemnitee, or an agent or employee of the indemnitee, or an independent contractor who is directly responsible to the indemnitee.

15

contract under Louisiana law.

*Conclusion*

For the foregoing reasons, the district court's denial of Cherokee's motions for preliminary and permanent injunction and its grant of summary judgment in favor of Aurora are AFFIRMED.