WIDENER, Circuit Judge,
concurring and dissenting:
I concur in part and respectfully dissent in part.
I agree with the result reached by the majority except the treatment of CLM’s claim under the Louisiana Act and the claim of Future Equipment Company under the Texas Deceptive Trade Practices and Consumer Act. In my opinion, the decision of the district court as to those claims should be vacated, and as to them should be remanded to the district court for further consideration.
I.
The key provision in CLM’s dealer agreement with Volvo is the Local Law Provision, or section 30 of the dealer *612 agreement. The Local Law Provision provides as follows:
The rights and obligations of the parties hereto shall be subject to all applicable laws, orders, regulations, directions, restrictions and limitations of governments and governmental agencies having jurisdiction over the parties hereto. In the event that any law, order, regulation, direction, restriction or limitation, appropriation ... or interpretation thereof shall, in the judgment of either party hereto, substantially alter the relationship between the parties under this Agreement or the advantages derived from such relationship, either party may request the other party hereto to modify this Agreement. If, within fifteen (15) days subsequent to making such request, the parties hereto are unable to agree upon a mutually satisfactory modification hereof, then the adversely affected party may terminate this Agreement on fifteen (15) days’ notice to the other party.
The Louisiana Act, La.Rev.Stat. Ann. §§ 51:481-82 (West 2003), applies to the CLM-Volvo dealer agreement. In Lake Charles Diesel, Inc. v. General Motors Corp., 328 F.3d 192 (5th Cir.2003), the court explained the prerequisites necessary for the Louisiana Act to apply. For the Louisiana Act to apply in this case, each of the following must be present:
1. A contract or agreement, written or oral;
2. The contract must be between (1) a dealer,[1] and (2) an agent.[2]
3. The dealer must be in the business of selling, distributing, or retailing.
4. The agent must be in the business of wholesaling, manufacturing, or distributing.
5. The tangible movable (personal) property that the dealer agrees to sell, distribute, or retail and that the agent agrees to wholesale, manufacture, or distribute must pertain to one or more of five industries only: (1) farming; (2) construction; (3) heavy industrial material handling;
(4) utility; or (5) lawn and garden.
6. The tangible movables that are the objects of the dealership contract must be one or more of the following types: (1) equipment; (2) engines; (3) implements; (4) machinery; or (5) attachments.
7. In addition to the type or types of equipment that are the objects of the dealership contract, the dealer must also agree to sell, distribute or retail, and the agent must also agree to wholesale, manufacture, or distribute repair parts for such equipment.
8. In the dealership contract, the dealer must agree to maintain an inventory of one or more of the following: (1) repair parts for the subject tangible movables; or (2) the tangible movables themselves; or (3) attachments.
Lake Charles Diesel, 328 F.3d at 200. The CLM-Volvo dealer agreement fulfills all of these prerequisites. Because the dealer agreement fulfills all of the prerequisites *613 outlined by the court in Lake Charles Diesel, the substantive sections of Title 51 apply to the dealer agreement. In particular, § 482 is applicable. Section 482(A)(1) provides that:
[n]o agent, directly through an officer- or an employee, may terminate, cancel, fail to renew, or substantially change' the competitive circumstances of a dealership agreement or contract without good cause.
La.Rev.Stat. Ann. § 51:482 (West 2003). Accordingly, § 482 is an applicable law under the Local Law Provision of the dealer agreement.
Under the majority’s interpretation of the Local Law Provision, § 482 is not applicable in this case because CLM failed to request a modification of its dealer agreement. Maj..Op. at 601-02. But the plain language of the Local Law Provision does not require CLM to request a modification of the dealer agreement in order to gain the protection of § 482. Under the Local Law Provision, either party, either Volvo or CLM, could have requested a piodification if it believed, “in [its] judgment” that a local law would substantially alter the contractual relationship between the parties. Neither CLM nor Volvo requested a modification. As the majority duly notes in its opinion, Volvo recognized that § 482 would alter the relationship between the two parties:
According to Volvo, the State Statutes, if applied, would effectively nullify the Without Cause Provision, substantially altering the relationship between Champion and the Dealers.
Maj. Op. at 601-02. Despite this realization, Volvo never sought a modification of the contract.
The Louisiana state legislature added § 482 to Title 51 in 1991. See La.Rev. Stat. Ann. § 51:482 (West 2003). Until the time of this addition, neither CLM nor Volvo was- subject to § 482(A)(i), and immediately upon enactment, and until 2000, either CLM or -Volvo could have asked for a modification of the>-.dealer agreement. The reason that CLM did not seek such a modification is at once apparent; under the dealer agreement, if there had been no applicable local law, the agreement could have been terminated under the Without Cause Provision of CLM Dealer Agreement § 24. At the time the dealer, agreement was signed in 1984, neither party had any cause to seek a modification. The passage of § 482 in 1991 modified the dealer agreement. CLM had no cause for concern, however, because it derived a benefit from § 482. Volvo, as it admits and as the majority notes in its opinion, did have its rights and advantages altered by the passage of § 482. Maj. Op. at 602. Since Volvo now recognizes the impact of § 482, as shown without objection, it could have recognized § 482’s significance at any time since 1991, and did not.
Furthermore, the Local Law Provision provided a method for Volvo to alter the dealer agreement to regain any advantages, in its judgment it lost by the passage of § 482. The majority opinion holds that only CLM bears the burden of requesting a modification of the dealer agreement, but as I have noted, the plain language of the Local Law Provision does not limit to CLM alone the ability to request a modification. The majority interprets the Local Law Provision so that, while § 482 alters the relationship of the parties, CLM loses on its claims because it did not request a modification. Using the same logic, the majority should, with equal facility, reach the opposite conclusion; that because § 482 alters the relationship between the parties, Volvo loses because it did not request a modification.
The majority offers no reason or justification for declaring Volvo the winner with *614 respect to the construction of this provision of the contract, which, by its literal terms, applies to “either party.” Indeed, a more logical and reasonable construction of the contract is that in the absence of a “request [of] the other party,” the literal terms of the contract should stand as written and unaltered.
Under the majority’s reasoning, CLM, as the party benefiting from § 482, must call Volvo’s attention to the existence of a provision that benefits CLM for the purpose of altering the relationship to the point where CLM loses the benefit of § 482. Such a departure from human nature is not a reasonable contract construction, I suggest.
II.
The Local Law Provision, section 30 of the dealer agreement, is reconcilable with the Choice of Law Provision in section 29. For example, prior to 1991, the Louisiana legislature had not enacted § 482. As a result, no local law triggered the application of the Local Law Provision. Had there been a contract dispute prior to 1991, it would have been governed by South Carolina law. After the passage of § 482, the contract is still governed by South Carolina law, except that § 482, as an applicable local law, applies as well.
Yet, under the majority’s interpretation of the contract, the Local Law Provision would be surplusage, violating the “universal law of contract law that, in construing language in a contract, ‘an interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless.’ ” Island Creek Coal Co. v. Lake Shore, Inc., 832 F.2d 274, 277 (4th Cir.1987) (quoting United States v. Johnson Controls, Inc., 713 F.2d 1541, 1555 (Fed.Cir.1983); see also Union Inv. Co. v. Fidelity & Deposit Co. of Md., 549 F.2d 1107, 1110 (6th Cir.1977)). The majority decision renders meaningless the contractual language in the Local Law Provision that “the rights and obligations of the parties ... shall be subject to all applicable local laws.”
In Liverpool & London Steamship Protection & Indemnity Association, Ltd. v. QUEEN OF LEMAN MV, 296 F.3d 350 (5th Cir.2002), the court faced a contract construction question similar to the one facing this court regarding the Local Law Provision and Choice of Law Provision in the dealer agreement. Liverpool & London Steamship Protection & Indemnity Association, Ltd., (L & L) provided protection and indemnity insurance to the owners and operators of the QUEEN OF LE-MAN. 296 F.3d at 351. The insurance contract between the parties contained four provisions that affected the choice of law that would govern the contract. First, Rule 40 of the contract stated that L & L “is entitled to ‘a lien on the ships of a member’ for any unpaid premiums.” Second, Rule 47 stated that “disputes are to be resolved either by arbitration or ‘by the English High Court of Justice.’ ” Third, Rule 47C stated that:
[n]othing herein shall affect or prejudice the right of the Association to take action and/or commence proceedings in any jurisdiction to enforce its right of lien on ships or to otherwise obtain security by seizure, attachment or arrest of assets for any amounts owed to the Association.
Finally, Rule 48 provided that
[t]hese rules and any special terms of entry form a contract of insurance between the Association and a member, and subject to the right of the Association under Rule 47C to enforce its right of lien in any jurisdiction in accordance with local law in such a jurisdiction, shall *615 be construed in accordance with English law.
See L&L, 296 F.3d at 353.
L & L filed a complaint in the Eastern District of Louisiana to seize the QUEEN OF LEMAN for unpaid insurance premiums. 296 F.3d at 351. The district court granted the request, and the vessel was arrested and later sold for $512,000.00. 296 F.3d at 351. The funds from the sale of the vessel were placed in the registry of the district court. Two parties, one who insured the vessel’s cargo and one who owned the vessel’s cargo, intervened seeking to recover the proceeds from the sale. The intervenors argued that the insurance contract called for the application of English law, under which L & L could not obtain a maritime lien. 296 F.3d at 351. The district judge agreed, granted summary judgment in favor of the intervenors, and L&L appealed to the Fifth Circuit. 296 F.3d at 351-52.
On appeal, the parties agreed “that English law generally governs the contract.” 296 F.3d at 352. They also agreed that the procedure for enforcing a lien was governed by the law of the jurisdiction in which the lien was being enforced, in this case the United States. The parties disagreed over whether English law, as the law that governs the contract generally, also determines whether a maritime lien exists. As the court noted, this disagreement is “significant because even L&L admits it would have no maritime lien under English law.” 296 F.3d at 352. In contrast, the federal Maritime Commercial Instruments and Liens Act, 46 U.S.C. §§ 31341-31343, makes a maritime lien available for a party who provides necessaries, which includes marine insurance in the Fifth Circuit, to a vessel. 296 F.3d at 353 (citing Equilease Corp. v. M/V Sampson, 793 F.2d 598, 603 (5th Cir.1986) (en banc)). The intervenors sought to persuade the court that the “reference to local law in Rules 47C and 48 is limited to the procedural aspects of enforcing liens.” The argument went that the substantive issue of any lien to which L&L may be entitled is governed by English law, but L & L may enforce the lien by relying on local procedural law. 296 F.3d at 353.
The court disagreed. If the choice of law provision controlled the maritime lien, then the provision in Rule 40 authorizing L & L to secure a maritime lien would have been rendered meaningless because English law did not recognize a maritime lien. 296 F.3d at 353. The court explained that
[i]f English law controls and there is no maritime lien for unpaid insurance premiums, then L&L would have little need for enforcement provisions, as no right would exist to be enforced.... We therefore agree with L&L that in order to give meaning to the entire contract, the determination of whether a maritime lien exists in the first place should be determined by United States law.
296 F.3d at 353-54. The court thus reversed the district court’s decision granting the intervenors’ motion for summary judgment. 296 F.3d at 355.
The Local Law Provision in the dealer agreement is similar to Rule 47C. By construing the contract to allow the Choice of Law Provision to trump another provision in the contract, the majority follows a path that the L&L court rejected because it would not give meaning to the entire contract. See L&L, 296 F.3d at 353-54. Because the Local Law Provision can be reconciled with the Choice of Law Provision, this court should allow CLM to pursue its rights under § 482, an applicable local law.
The dealer agreement should be construed to give effect to all of its provisions. See Osteen v. T.E. Cuttino Constr. Co., 315 *616 S.C. 422, 434 S.E.2d 281, 284 (1993). The majority’s interpretation gives no effect to the Local Law Provision. In my opinion, CLM is entitled to the protection of the Louisiana Act, and CLM’s claims and counterclaims under the Louisiana Act should be remanded-to the district court.
III.
On remand, the district court should have South Carolina law and the Louisiana Act as the governing law for interpreting the CLM-Volvo dealer agreement. The district court should enforce the Louisiana Act unless there is a rule in North Carolina that prevents the district court from enforcing the Louisiana Act, and no such rule has been brought to pur attention. Accordingly, the Louisiana Act should be enforced by the district court on the basis of the Local Law Provision.
The majority concluded that the CLM dealer agreement is to be construed according to South Carolina law. Maj. Op. at 601. The majority reached this decision by applying North Carolina’s choice of law rules, which enforce choice of law provisions in contracts. Maj. Op. at 601; see also Bueltel v. Lumber Mut. Ins. Co., 134 N.C.App. 626, 518 S.E.2d 205, 209 (1999). South Carolina law, while retaining the rule of lex loci contractus,[3] also recognizes the right of parties to choose another jurisdiction’s law to govern the contract. Associated Spring Corp. v. Wilson, 410 F.Supp. 967, 975 (D.S.C.1976). The Associated Spring Corp. court relied on the following language from the South Carolina Supreme Court’s opinion in Livingston v. Atlantic Coast Line R. Co., 176 S.C. 385, 180 S.E. 343 (1935):
It is fundamental that unless there be something intrinsic in, or extrinsic of, the contract that another place of enforcement was intended, the lex loci con-tractu governs. If the contract be silent thereabout, the presumption is that the law governing the enforcement is the law of the place where the contract is made.
“The act of the parties in entering into a contract at a particular place, in the absence of anything shown to the contrary, sufficiently indicates their intention to . contract with reference to the laws of that place; hence the rule as it usually stated is that a contract as to its validity and interpretation is governed by the law of the. place where it is made, the lex loci contractu; or more accurately, that contracts are to be governed as to their nature, validity and interpretation by the law of the place where they are made, unless the contracting parties clearly appear to have had some other place in view.” 13 C.J., 248.
180 S.E. at 345.
In Livingston, the South Carolina Supreme Court' explained that South Carolina law allows parties to choose the law that they want to use to enforce their contract. See Associated Spring Corp., 410 F.Supp. at 975 (noting that this view is “widely-held and is generally in conformity with that of the Restatement (Second) of Conflict of Laws § 187 (1971)”). Under the Restatement (Second) of Conflict of Laws § 187(2), South Carolina law will govern the contract unless the
application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, *617 would be the state of the applicable law in the absence of an effective choice of law by the parties.
The majority refuses to remand CLM’s claims and counterclaims under the Louisiana Act to the district court on the ground that the Louisiana Act does not constitute a fundamental policy of Louisiana. Maj. Op. at 607-08. In my opinion, this reasoning is not only overly-and hyper-technical, it is fundamentally wrong. A statute enacted by a state legislature establishes the public policy of that State. See Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 524, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959) (“Policy decisions are for the state legislature, absent federal entry into the field.”);Barnes Group, Inc. v. C & C Prods., Inc., 716 F.2d 1023, 1031 (4th Cir. 1983) (“[I]t seems apparent that where the law chosen by the parties would make enforceable a contract flatly unenforceable in the state whose law would otherwise apply, to honor the choice-of-law provision would trench upon that state’s ‘fundamental policy.’ ”).
Every state court in the Fourth Circuit has also recognized the state legislature as the definitive voice on pronouncements of public policy. See Schmeizl v. Schmeizl, 186 Md. 371, 46 A.2d 619, 621 (1946) (“The court cannot adopt a public policy contrary to the plain provisions of the statute.”); Pitt & Greene Electric Membership Corp. v. Carolina Power & Light Co., 255 N.C. 258, 120 S.E.2d 749, 754 (1961) (“[PJublic policy is for legislative determination.”); Brown v. Drake, 275 S.C. 299, 270 S.E.2d 130, 132 (1980) (“Public policy is basically for the legislature”); Wood v. Board of Supervisors of Halifax City, 236 Va. 104, 115, 372 S.E.2d 611 (1988) (“[I]t is the responsibility of the legislature, not the judiciary, to formulate public policy.”); State v. Varney, 142 W.Va. 105, 96 S.E.2d 72, 76 (1956) (“... the public policy of a state is a law of the state, and is a legislative and not a judicial function, and it is not the function of the judiciary to declare what is the public policy of the state respecting matters on which the legislature has spoken ... ”).
The Supreme Court of Louisiana especially has expressed its opinion as to whether statutes express the public policy of Louisiana in a case involving a state antitrust law. State v. American Sugar Refining Co., 138 La. 1005, 71 So. 137, 142-143 (1916).
... the public policy of a state is to be found in its statutes, and, when they have not directly spoken, then in the decisions of the courts. But, when the Legislature speaks upon a subject upon which it has the constitutional power to legislate, public policy is what the statutes passed by it enacts public policy to be. The only authentic and admissible evidence of public policy of a state on any given subject are its Constitutions, laws, and judicial decisions. The public policy of a state, of which courts take notice and which they give effect, must be decided from those sources. Where the state has spoken through its legislators, there is no room for speculation as to what the policy of the state is.
So, in my opinion, it is beyond argument that the fundamental policy of Louisiana is expressed in § 51:482.
Section 51:482, barring cancellation of the contract without cause, was enacted by the Louisiana state legislature. In this circuit, nothing else appearing, we must accept that statute as the fundamental public policy of Louisiana. See Hall v. McKenzie, 537 F.2d 1232, 1234 (4th Cir. 1976)(“[T]he determination of legislative policy for the State of West Virginia is for that state and not us.”); St. Paul Fire & Marine Ins. Co. v. Jacobson, 48 F.3d 778 (4th Cir.1995) (“[W]e will not attempt to *618 decide the public policy of the State of Virginia absent a clear and dominant articulation of that policy by the Commonwealth herself.”)- By concluding that the Louisiana Act does not constitute a fundamental policy of Louisiana, the majority is making its own determination that the Louisiana Act, as a statute, does not express the fundamental public policy of Louisiana. Our court cannot determine the public policy of Louisiana, even if the Fifth Circuit is willing to do so. See St. Paul Fire & Marine, 48 F.3d at 783. C.f. Cherokee Pump & Equipment, Inc. v. Aurora Pump, 38 F.3d 246, 252-53 (5th Cir. 1994). Instead, the Louisiana state statute must be viewed as the fundamental public policy of that State.
Whatever the Fifth Circuit may have decided, Cherokee Pump is a flawed authority on which to rest our decision. Cherokee Pump recites, 38 F.3d at 253, that “There is no case law evidencing that the Repurchase Statute amendment espouses public policy in Louisiana.” Along the same line, the majority in this case recites that “The Louisiana courts have not addressed this issue,” referring to whether the Louisiana statute is a fundamental policy of Louisiana. Although State v. American Sugar Refining Co., 138 La. 1005, 71 So. 137 (1916) has been in full force and virtue in that State for some 88 years and has not been modified or overruled, both the Fifth Circuit and the majority here persist in their reasoning that the subject has not been addressed by the Louisiana courts. To repeat, American Sugar stated:
But, when the Legislature speaks upon a subject upon which it has the constitutional power to legislate, public policy is what the statutes passed by it enacts public policy to be.
71 So. at 142. That certainly should end the discussion, but just as Cherokee Pump did not mention American Sugar, so the majority here does not. Such omission, both by the Fifth Circuit and this court, is flawed reasoning, I suggest.
If that were not enough, and of even more importance, the case of Barnes Group, Inc. v. C & C Prods., Inc., 716 F.2d 1023 (4th Cir.1983), is on facts which are indistinguishable from those at hand, and, on the same question, determines that where the law chosen by the parties would make enforceable a contract flatly unenforceable in the State whose law would otherwise apply, “the choice of law provision would trench upon that State’s ‘fundamental policy.’ ” 716 F.2d at 1031. Banes Group was a case in which Barnes, the plaintiff, alleged that C & C, the defendant, had interfered with Barnes’ contracts with six of Barnes’ sales agents. Barnes was an Ohio company, and its contracts with its agents provided that they should be construed in accordance with the laws of the State of Ohio. Three of the salesmen, however, were from Alabama, and their territories were exclusively in Alabama. The contract of employment, which included a covenant not to compete, was void as against public policy under Alabama law and could not be enforced. The holding of this court was:
To honor the contractual choice of law would make enforceable a contract flatly unenforceable in Alabama, surely impinging upon “fundamental policy” of Alabama. It was error, therefore, for the district court to apply Ohio law to determine the enforceability of the Alabama salesmen’s covenants not to compete.
716 F.2d at 1032. Applying the facts of this case to the holdings of Barnes Group, the law chosen by the parties, South Carolina, would permit a contractual provision for cancellation to be without notice, and would make enforceable in Louisiana a *619 contract “flatly unenforceable” in Louisiana under § 51:482, the law of that State. The holding of Barnes Group is that such a choice-of-law provision would “trench upon [Louisiana’s] ‘fundamental policy.’ ” 716 F.2d at 1031. And the impinging of the fundamental policy of Louisiana, error here as there, means that the statute of Louisiana, § 51:482, must be applied. Louisiana is the State in which the dealership is located, and which even the majority in this case agrees had a greater interest than the chosen State of South Carolina.
Applying the rule of § 187(b) Restatement (Second) Conflict of Laws to this case indicates that the Louisiana Act should apply, for if the “application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue” the law of South Carolina should not apply. I have just demonstrated that the fundamental policy of Louisiana is expressed in the statute requiring that such contracts not be cancelled by the manufacturer without cause. It is also beyond doubt that Louisiana has a materially greater interest than South Carolina in determining whether a dealer agreement between a Louisiana dealer and an out-of-state manufacturer can be terminated without cause. The majority holds just that with relation to the Arkansas dealer,[4] and no reason is apparent why the Louisiana dealer should be treated differently on what are essentially the same facts. The only difference in the two statutes is that Arkansas has some kind of anti-waiver provision mentioned by the majority, but even Arkansas does not have an opinion of its Supreme Court taking nearly so strong a stand as the position of the Louisiana court in American Sugar that statutes reflect the fundamental policy of Louisiana. In my opinion, the clearly implicit holding of the majority, that a statute without an anti-waiver provision is not the fundamental policy of a State, is clearly wrong.
IV.
I am further of opinion that the claim of Future Equipment Company, Inc. under the Texas Deceptive Trade Practices and Consumer Protection Act, Vernon’s Texas Statutes and Codes Ann., Title II, § 17.41, et seq., should be re-examined on the merits.
This case is a result of a “judgment on the pleadings,” A.486, and not based on depositions, affidavits, etc., a factual development, as is the more usual case.
For the purposes of the court’s consideration of the motion [for judgment on the pleadings], all of the well pleaded factual allegations in the adversary’s pleadings are assumed to be true, and all contravening assertions in the movant’s pleadings are taken to be false.
5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure 520 (2d. ed.1990) relying on National Metropolitan Bank v. U.S., 323 U.S. 454, 457, 65 S.Ct. 354, 89 L.Ed. 383 (1945) and various cases from the federal courts of appeals and district courts. In Count III of the Arkansas complaint found in this appendix at A.298, the following allegation is made by Future Equipment Company:
53. At all times material to this action, FEC was a ‘business consumer’ as that term is defined in the Texas Deceptive Trade Practices and Consumer Protection Act (‘DTPA’), Tex. Bus. & Com. *620 Code, § 17.41, et seq., in that FEC is a corporation or business that sought and/or acquired goods or services by purchase or lease, and the goods or services formed the basis of them claims.
Section 17.45(10) provides that:
‘Business Consumer’ means an individual, partnership or corporation who seeks or acquires by purchase or lease, any goods or services for commercial or business use. The term does not include this state or a subdivision or agency of this state.
So, for the purposes of judgment on the pleadings under Rule 12, as here, we must consider that FEC is a “business consumer, a corporation who seeks or acquires by purchase or lease ... goods or services for commercial or business use.” That is sufficient to qualify Future Equipment to have its claim examined under the Texas Deceptive Trade Practices and Consumer Protection Act under Texas law as found in Fisher Controls Intern., Inc. v. Gibbons, 911 S.W.2d 135 (Tx.App.1995) and Texas Cookie Co. v. Hendricks & Peralta, 747 S.W.2d 873 (Tex.App.1988). Briefly, Texas Cookie held that the fact that the transfer agreement “involved the transfer of ‘goods or services’ for purpose of the DTPA,” Texas Cookie, 747 S.W.2d at 877,
qualified Hendricks for relief under the Texas Deceptive Trade Practices and Consumer Act, the same statute involved here.
This is not to say that a future factual development may not add to the facts favorable to Future Equipment or to the facts favorable to Volvo. But it is clear that judgment in favor of Volvo should not have been entered on the pleadings which admit the necessary facts, and that the case on remand should require examination and development of that aspect or Future Equipment’s claim.
In all events, if the majority holding is correct, that Future Equipment loses because “FEC does not allege that it paid for an intangible right to continue to be a champion dealer and no payment is reflected in the dealer agreement,” there would have been no dealership contract to cancel, and this case is nothing more than an exercise for the lawyers.

. A dealer is defined by statute to mean "any farm dealer, heavy industrial equipment dealer, construction equipment dealer, material handling equipment dealer, utility equipment dealer, engines equipment dealer, lawn and garden equipment dealer or retail equipment distributor dealer.” La.Rev.Stat. Ann. § 51:481(B)(3) (West 2003).

. An agent is defined by statute to mean "any manufacturer, wholesaler or wholesale distributor.” La.Rev.Stat. Ann. § 51:481(B)(4) (West 2003).

. The rule of lex loci contractus means "the law of the place where the contract is made governs the contract.” Joye v. Heuer, 813 F.Supp. 1171, 1173 (D.S.C.1993) (citing Livingston v. Atlantic Coast Line R. Co., 176 S.C. 385, 180 S.E. 343, 345 (1935)).

. “And Arkansas has a materially greater interest than South Carolina in determining whether a dealer agreement between an Arkansas dealer and an out of state manufacturer can be terminated without cause.” Maj. Op. at 610.